985 P.2d 924 (1999)
139 Wash.2d 211
In the Matter of the Disciplinary Proceeding Against A. Eugene HAMMERMASTER, Municipal Court Judge.
No. JD # 15.
Supreme Court of Washington, En Banc.
Argued June 10, 1999.
Decided October 7, 1999.
*926 Kurt Bulmer, Seattle, for Judge Hammermaster.
Byrnes & Keller, Paul R. Taylor, Seattle, for Commission on Judicial Conduct.
Beth M. Andrus of Skellenger Bender P.S., for amicus curiae American Civil Liberties Union of Washington.
*925 MADSEN, J.
Municipal Court Judge A. Eugene Hammermaster appeals a determination by the Commission on Judicial Conduct (the Commission) ordering censure, and recommending suspension for 30 days without pay. The Commission found that Judge Hammermaster violated the Code of Judicial Conduct (CJC) Canons 2(A), 3(A)(1) and 3(A)(3) by making improper threats of life imprisonment and indefinite jail sentences, improperly accepting guilty pleas, holding trials in absentia, and engaging in a pattern of undignified and disrespectful conduct toward defendants. Judge Hammermaster admits that he engaged in the alleged conduct, but maintains that his conduct was a reasonable exercise of judicial independence which did not violate the Canons. We affirm the Commission's findings of misconduct, but also find that Judge Hammermaster's practice of ordering defendants to leave the country constitutes a violation of Canon 3(A)(3). We substantially agree with the Commission's order of censure but find that a six-month suspension without pay is more appropriate than the sanction recommended by the Commission.

Facts
Judge Hammermaster is an appointed part-time municipal court judge for the Sumner, Orting, and South Prairie courts of Pierce County, Washington. He has been a judge for one or more of these courts for 30 years. Report of Commission Proceedings (RP) at 322. On June 25, 1996, the Commission on Judicial Conduct received a letter of complaint about Judge Hammermaster from an inmate at the Sumner City Jail who was serving jail time because he had not paid a fine imposed by the judge. In the letter the inmate stated that "Judge Hammermaster has told me before that if I didn't pay my 300$ (sic) fine he would throw me in jail for life. I've sat out the time in jail to pay off the fine but thats (sic) not exaptbl (sic) to him." CJC, Finding of Probable Cause (May 13, 1998). The letter goes on to request an investigation of the inmate's situation.
In response to the complaint, the Commission reviewed 21 cases in which Judge Hammermaster had presided between June and November 1996, to determine whether and to what extent any misconduct occurred. A number of those cases are discussed below and serve as examples of the Commission's case in chief.
On March 17, 1998, the Commission filed a Supplemental Statement of Allegations and informed Judge Hammermaster that the Commission was pursuing initial proceedings against him.[1] On April 22, 1998, the Commission *927 filed its final amended Statement of Charges, alleging that Judge Hammermaster had engaged in misconduct which violated Canons 1, 2(A), 3(A)(1) through (5), and 3(B)(3) of the Code of Judicial Conduct. Amended Statement of Charges (April 22, 1998) at 8 (hereafter Statement of Charges).
The Commission's first allegation charged that the judge had abused his authority and exhibited a demeanor that is not respectful or dignified by threatening defendants with life imprisonment or indefinite jail sentences; routinely ordering Spanish-speaking defendants to enroll in English courses, become citizens or leave the country; issuing or threatening to issue orders beyond his legal authority as a municipal court judge; and making statements or issuing orders that denigrate unmarried individuals who lived together. Statement of Charges at 1-4.
The Commission's second allegation charged the judge with conducting criminal proceedings in a manner which violated defendants' basic due process rights, thus calling into question the integrity and impartiality of the judicial office and his own competence and faithfulness to the law. The allegation was based on Judge Hammermaster's practice of accepting guilty pleas without first determining whether defendants' pleas were knowingly, voluntarily, and intelligently made; the use of guilty plea forms which failed to comply with CrRLJ 4.2; holding trials in absentia; and using unlawful not guilty plea forms. Statement of Charges at 3-4, 6.
The Commission's third allegation charged that the judge's conduct raised the appearance of impropriety as a result of (1) his relationship with the City of Orting Police Chief whom he allowed to act as a city attorney before the court and (2) an alleged arrangement that his son serve as a pro tem judge in his absence. Statement of Charges at 7-8. The allegation regarding the Police Chief was dismissed by stipulation.
Judge Hammermaster admitted that he engaged in conduct which the Commission has grouped into five types of inappropriate behavior: (1) improper threats of life imprisonment; (2) denial of basic due process in taking guilty pleas; (3) trials in absentia; (4) conduct that is not "dignified, patient or courteous"; and (5) ordering Hispanic defendants to leave the country. Commission Decision (CD) at 2-5. He disagreed with the Commission's characterization of that conduct as improper, however.
The Commission held a hearing on May 13 and 14, 1998, and filed its decision on August 7, 1998. With regard to the allegation regarding Judge Hammermaster's son serving as a pro tem judge, the Commission found no intentional arrangement had been made and thus concluded no violation had been committed. CD at 5. The Commission also found that the allegation charging the judge with abuse of authority in his treatment of Hispanic defendants was proved, but declined to find a violation of the Canons because federal law regarding a court's authority to order persons to leave the country is ambiguous and because the orders were alternatives to other lawful conditions of sentencing. CD at 6. Eight members found that Judge Hammermaster had committed the remaining acts of alleged misconduct and concluded that such misconduct violated Canons 2(A), 3(A)(1) and 3(A)(3). CD at 5-6.
After considering aggravating and mitigating factors, the Commission ordered censure and recommended suspension for 30 days without pay. CD at 7-8. The Commission also ordered that Judge Hammermaster take a corrective course of action including (1) completing judicial education courses in criminal procedure, ethics, and diversity, approved in advance by the Commission and paid for at his own expense; (2) meeting with a judicial mentor prescribed by the Commission; and (3) Commission monitoring for a period of two years. CD at 7-8.
One member of the Commission filed a dissenting opinion. He found only one violation based on Finding of Fact 3(a)[2] and disagreed with the majority's recommended *928 discipline, arguing instead for reprimand. CD at 3-4, 8 (Dissent by Judge Schultheis).
1. Improper threats of life imprisonment
Judge Hammermaster told 12 different defendants that he would either impose an indefinite jail sentence or life imprisonment until fines and costs were paid. The following excerpts from a few of those cases are illustrative.
In City of Sumner v. Link, No. 15779, the defendant requested another chance to make arrangements to pay his fines:
Judge: Then why shouldn't I treat you the same way you treated me? So that's back to my original question, should I not just allow you to remain in jail?
Defendant: By rights I would, that's what I'm expecting you to do, but I ask of you not to.
Judge: Why should I not do it?
Defendant: Because this is the last time I will allow myself to not comply with what I tell you. I can't believe that, this is the third time I've had to see you for this, such matter and
Judge: In other words what I should do is find you in contempt of court, should I not?
Defendant: Yes, you should.
Judge: And if I do that, then you're going to have to pay 40 dollars a day, each day you're in jail, which means you'd be in jail the rest of your life because every week you'd owe another 300, every month you'd owe another roughly 1200, every year you'd owe roughly another 15 thousand.
....
Defendant: Okay, after I leave here today and if I don't make contact with somebody that would do this for me, what do I do then?
Judge: I guess you stay in jail the rest of your life. I can't think of any other alternative. I've given you two alternatives. If you want to come up with a third one, do so, but I gave you two of them. And I guess you don't like either one of them....
....
Defendant: No, no I just can't, I can't call my grandmother to call because she will then call my mother and my mother will say I won't do it, so why should you. Nobody just thinks that I[sic] worth giving the chance to. I haven't given anybody a reason for that.
Judge: Well, you've sure given me reasons. You've lied to me time after time after time. Maybe you've lied to them too, I don't know. You've given me lots of reasons to throw away the key.
Defendant: I know that sir.
Judge: In fact, I guess you should feel fortunate that at this point I've not found you in contempt of court.
Exhibits Notebook (Link) at 1-2, 6-7.
In seven other cases, Judge Hammermaster made nearly identical comments regarding the defendant's debt compounding to such a high amount that he would have to find the defendant in contempt of court, and the defendant would have to stay in jail either indefinitely or for life. See City of Orting v. Lybeck, No. 5382; City of Sumner v. Sattler, No. C00010554; City of Orting v. Sita, No. 4605; City of Orting v. Powell, No. 6120; City of Sumner v. Leggitt, No. 13846; City of Sumner v. Ceras-Campos, Nos. XXXXXXXXX, C00010522; City of South Prairie v. Batten, No. C00058228; City of Orting v. Cebula, No. C00000189.
In City of Sumner v. Reisenauer, No. 13361, the defendant appeared before the court on a warrant for failure to make payment on his fine.
Defendant: I haven't paid anything because I didn't have a real job. I was only working part-time.
Judge: Go ahead.
*929 Defendant: I don't make a lot of money when I'm working part-time, I made 5 dollars an hour.
Judge: Wouldn't it make sense that you spend the rest of your life in jail?
Defendant: No.
Judge: Why not?
Defendant: Because I don't want that.
Judge: What difference does it make?
What's the other choice?
Exhibits Notebook (Reisenauer) at 4.
In City of Orting v. Deen, No. C00000280, where the defendant was explaining why he did not contact the court, Judge Hammermaster stated, "Well, is that what the answer is, that you should stay in jail indefinitely?" In his concluding remarks, after making arrangements for the defendant to pay, Judge Hammermaster then stated: "The only time I throw the key away is when they act like you."
In City of Sumner v. Luddington, No. 16210, Judge Hammermaster remarked: "So I should find you in contempt of court and throw the key away."
In Judge Hammermaster's testimony before the Commission he admitted that he knew the law did not allow for life imprisonment for failure to pay fines[3] and that he has no authority as a municipal court judge to impose such sentences. Judge Hammermaster also testified that he did not know if a fact-finding hearing was required before imposing sanctions on delinquent defendants. Further, when asked whether he believes that he has the authority to impose any sanction he wants, Judge Hammermaster responded "I don't think so, but I don't know where the limitations are. I don't know that I've ever thought about that." Verbatim Report of Proceedings (RP) at 94.
2. Denial of due process in taking guilty pleas
The defendants in 10 cases under review expressed an intent to plead guilty. In each case, Judge Hammermaster required the defendant to sign a guilty plea form, which the judge had approved.[4] These forms contained neither the elements of the offense charged nor the penalties available, but says simply:
I am the defendant in this case. I plead guilty to the crime(s) of _______________ ________________________________________.
I understand that, by this process, I am giving up my constitutional right to a jury or bench trial, the right to hear and question witnesses, the right to call witnesses in my own behalf, the right to testify or not to testify, and the right to appeal the determination after trial.
I understand that the judge can impose any sentence up to the maximum, no matter what the prosecution or I or my attorney recommends. I further understand that the State of Washington may suspend or revoke my drivers license. (to be deleted if not applicable).
No one has made any threats or promises to get me to plead guilty.
________ ____________________
DATE DEFENDANT
 _________________________
 DEFENSE ATTORNEY
Comm'n Ex. at 3.
A comparison of the form used by Judge Hammermaster with that recommended by CrRLJ 4.2 demonstrates that much of the vital content has been omitted. Among other things, CrRLJ 4.2 requires that the plea form include: the elements of the charged offense, an indication that the defendant has been informed of and understands the nature and elements of the offense, and the potential penalties for the offense. CrRLJ 4.2.
Not only were the plea forms deficient, the omissions were not corrected during the plea colloquy. The judge accepted these pleas *930 without first determining whether the defendant was aware of the elements of the crime charged and whether the guilty pleas was knowing, voluntary, and intelligent. Further, he did not inform defendants of the maximum and minimum sentences for the offenses to which they plead. His colloquy with defendants regarding the plea was typically limited to the following:
Judge: [Y]ou've been charged with a violation of an ordinance of the City of Sumner allegedly taking place on or about April 29, 1995, when you were charged with driving while your license is suspended or revoked in the third degree. As to this charge you have two choices. First, you have the right to enter a plea of not guilty, in which event a trial date will be set. Second, you have the right to enter a plea of guilty, in which event sentencing would take place at this time. Are you prepared to make some disposition of the matter?
Defendant: Yeah, guilty.
Judge: Plea of guilty will be entered.
Exhibits Notebook (Petroff) at 1; City of Sumner v. Petroff, No. C00010269.[5]
In two cases in which the defendants inquired specifically as to the penalties associated with their charges Judge Hammermaster failed to provide the information. In City of Sumner v. Potter, No. C00010615, the defendant asked Judge Hammermaster
"What is the recommended or the standard days?"
The judge replied:
I don't have any idea. I'll hear from you and I'll make my decision on that. All right, you want to step up here and take that statement on your plea of guilty, take it back to the table, read it and sign it. Right at the table there. All right, Mr. Potter, why were you driving when you didn't have a valid license?
Exhibits Notebook (Potter) at 2.
In another case involving a Spanish interpreter, City of Sumner v. Perez-Cuiriz, No. C00010069, Judge Hammermaster accepted the defendant's written plea of guilty and proceeded with the terms of the defendant's penalty without engaging in any discussion regarding the defendant's ability to understand the nature of the offense, the maximum penalties, or the rights he was giving up by pleading guilty. See also Comm'n Ex. 3.
In all of the cases reviewed by the Commission in which the form was used, these defendants were unrepresented.[6] Judge Hammermaster did not ask any of the defendants whether they could afford counsel or if they wished to give up the right to an attorney prior to signing the form or pleading guilty.
Judge Hammermaster testified that he believed his method of accepting guilty pleas was sufficient because defendants also receive forms and pamphlets explaining their constitutional rights in addition to court information and procedures. Judge Hammermaster further testified that he believed the form was in substantial compliance with CrRLJ 4.2 because city prosecutors and defense attorneys had assisted in the drafting. At the same time, he conceded that it is ultimately his responsibility to make sure guilty pleas by defendants are knowing, voluntary, and intelligently made. One prosecutor for the City of Sumner testified that she believed the forms were in substantial compliance with the rule, and that ultimately, it was the prosecutor's job to inform defendants of their rights. The Sumner City Attorney further indicated that at the time the forms were drafted, she "took comfort" in the fact that an American Civil Liberties Union (ACLU) attorney had reviewed the language and did not raise concerns about it. RP at 230. However, she also conceded that the ACLU never indicated the form was satisfactory.
Judge Hammermaster testified that he did not know that an explanation of the elements of the offense was required. He further testified that he did not understand that he was also required to explain the maximum *931 and minimum sentences when accepting guilty pleas.
3. Trials in absentia
Judge Hammermaster admits that since 1993, he has routinely held trials without defendants being present. He purports to obtain authority for this practice by securing defendant's signature on a form entitled, "Statement of Defendant on Plea of Not Guilty," in which the defendant not only waives the right to counsel at arraignment and right to a jury trial, but also the right to be present at trial. Comm'n Ex. 2. The following is an example of the forms Judge Hammermaster used:
I AM THE DEFENDANT IN THIS CASE. I WISH TO ENTER A PLEA OF NOT GUILTY.
I understand that I have the right to be represented by a lawyer and that the court will appoint one for me if it is determined I cannot afford one. I waive the right to be represented by a lawyer at this time. I understand this does not preclude me from asserting the right to a lawyer later in the proceedings.
I hereby waive my right to a jury trial. I may withdraw this waiver and request a jury trial, provided I do so within 10 days of this arraignment date.
I will appear on the time for court dates or a warrant may be issued for my arrest. If I am not in attendance at the time of trial, including the commencement thereof, it is because I have deliberately and intentionally refused to be present, and under such circumstances request that I be deemed "excused" by the court pursuant to CrRLJ 3.4.
If I fail to appear, the State of Washington may suspend or revoke my driver's license. (if applicable).
________ ______________________
Date Defendant
 ______________________
 Defense Attorney
Comm. Ex. 2.
In eight of the cases examined by the Commission, Judge Hammermaster used the above forms.[7] In two of those cases, the judge proceeded to trial in the defendants' absence. When the defendants finally appeared in the later two cases, Judge Hammermaster proceeded to sentencing.
In City of Sumner v. Potter, No. C00010615, the defendant stated that he had intended to plead not guilty at his trial, but ultimately pleaded guilty when he learned the court had proceeded to trial in his absence.
Judge: All right. What is your intention concerning these two charges, driving while your license is suspended in the second degree and negligent driving resulting in a collision.
Defendant: First degree.
Judge: Beg your pardon?
Defendant: Negligent driving in the first degree?
....
Defendant: I was going to plead not guilty at the trial, but I guess
Judge: All right. Are you going to change your plea to guilty right now?
Defendant: I wanted to plead not guilty, but I guess I have to if you guys went ahead to the trial with me not being there.
Judge: Well, that's, you need to tell me if you're to going to ask me for a new trial date, you need to tell me why I should do that when you failed to show up the first time.
....
Defendant: I was going to try and see if I can get a second trial, but if you don't.
Judge: Well, you can talk away, but I'm certainly not going to let you out of jail until the trial date.
Defendant: I guess I'm going to have to plead guilty then.
Judge: It's up to you. Is that what you want to do?
Defendant: Yes, I'll just plead guilty.

*932 Judge: All right.
Exhibits Notebook (Potter) at 1, 2.
Similarly, in City of Sumner v. Erroll Cayald, Case No. C00010318, the defendant appeared before the court after a trial was held in his absence.
Judge: City of Sumner and Erroll Cayald, C-a-y-a-l-d. All right, Mr. Cayald your matter went to trial in your absence. Any reason why I should not enter a finding of guilty and proceed to sentence you?
Defendant: Yes, sir. Last week, I was disoriented. What happened was I thought it was one o'clock and not this, that morning. I came in and talked to the clerk that afternoon.
Judge: And what's your defense to this matter?
Defendant: I didn't receive any kind of a notification or anything that the license was suspended.
....
Judge: Anything else that I should know before I proceed to sentence on this matter?
Defendant: No, sir.
Exhibits Notebook (Cayald) at 1, 2.
According to Judge Hammermaster, the not guilty form effectively excuses the defendants when they do not appear at trial, and thereby provides him with the authority to hold trials in absentia. Moreover, Judge Hammermaster testified that the method in which he holds trials in absentia provides defendants an opportunity to request a continuance or to ask for a new trial, once a defendant does appear after his or her trial has been held.
4. Conduct that is not "dignified, patient or courteous"
Judge Hammermaster admits to making various remarks in at least four of the cases examined by the Commission, one involving a mentally ill individual, and three others involving the relationship of unmarried individuals. Judge Hammermaster testified that in each of those cases, he did not intend his remarks to be offensive and that they were reasonable given the context in which they were made.
The defendant in City of Sumner v. Amburgy, No. C00010460, had bipolar disorder and attempted to explain his condition to the Judge:
Defendant: All right, well, I was in Western State for, since that happened. I was sick and I didn't have any medication cause I've got a bipolar disorder, manic depressant and I, I did it because I just can't stand, I can't get a job, I can't get a job. I've filled out applications already, I did, they put me in Western State because of this, part of this. At the same time they put me in Western State. I was in there, first it was a couple of weeks at Puget Sound, then it was 90 days in Western State. They released me on Halloween this year and I've already filled out applications and I was, I was happy to be alive today just to be able to come down here because I can't handle it, I'm ready to go to the hospital again today. I can't handle it. I try to get a job everywhere man and nobody will f______ hire me. I can't stand being alone and being bored all the time.
....
Judge: For somebody to say they're bored is ridiculous. If you're bored it's your own fault. It sounds to me like a bunch of pity pot, feeling sorry for yourself, which as far as I'm concerned is garbage.
....
I mean it appears to me you're just sticking your head in the sand and feeling sorry for yourself, and frankly I don't buy that. For somebody to say they're bored, then go volunteer some place.

*933 ....
I mean I just don't agree with your analysis of being bored. That's a ridiculous excuse. I mean, see how bored you'd be if you were sitting in jail with nothing.
....
You'll probably be coming back next time and saying they're keeping me so busy I'm going to crack up. Now you're telling me you're so bored you're going to crack up and if you say well, I'm so busy I'm going to crack up, I know how to solve that too. There's a place here where you can have free room and board where you won't be busy at all, called the crow bar hotel. Ridiculous, is it not?
Exhibit Notebook (Amburgy) at 1, 2, 3, 4, 6.
In his testimony before the Commission, Judge Hammermaster indicated that he used the term "bored" in this conversation in an attempt to motivate the defendant to become involved in the community.
In City of Sumner v. Elliot, No. C00010705, Judge Hammermaster threatened to order the defendant to stop living with his girl friend and also order the car that belonged to defendant's girl friend sold:
Defendant: It's just a money problem, you know, I'm trying, trying to get them paid, but you know rent, and the power and the phone, it's just ... I have a girlfriend with two young daughters, it's very hard.
Judge: Any reason why I shouldn't order you to sell your car?
Defendant: I don't own a car, your honor.
Judge: Well, who's car were you driving?
Defendant: That was my girlfriend's.
Judge: Well, Maybe I should order you to stop living with your girlfriend, then, if that's causing your problem. I mean, if you're supporting her, and not taking care of your situation, you're driving her car, sounds like you better terminate that.
Exhibits Notebook (Elliot) at 3.
Judge Hammermaster testified that the above remarks were intended to determine the appropriate sentence and the defendant's ability to pay.
In City of Orting v. Sita, No. 4605, Judge Hammermaster criticized the defendant's living arrangement with his girl friend when discussing defendant's inability to pay his fine:
Defendant: I'm spending over a hundred dollars worth of food a week.
Judge: Why so much?
Defendant: Because I have a girlfriend that lives with me.
Judge: Ah, so you're supporting somebody else, why didn't you get rid of that? Is she employed?
Defendant: She's trying to find work.
Judge: So you're supporting somebody.
Defendant: Yes.
Judge: I'd suggest you get rid of her. So you're just throwing away money there. Why is she not working?
Defendant: I don't know, sir, I really don't.
Judge: Then why are you allowing her to live with you and freeloading off of you?
Exhibits Notebook (Sita) at 7. Again, Judge Hammermaster explained that such remarks were meant to determine the defendant's ability to pay.
In City of Sumner v. Petroff, No. C00010269, Judge Hammermaster indicated that, in light of defendant's "meretricious relationship" with his girl friend, he would order the car owned by defendant's fiancée sold if it was not licensed and insured by the end of the year. Here, Judge Hammermaster explained that his remarks were based on his belief that defendant had a legal interest in his girl friend's car.
5. Ordering Hispanic defendants to leave the country
Judge Hammermaster admits that he frequently asks Hispanic defendants if they are *934 "legal" and orders them to enroll in English classes, "become legal," and/or leave the country within a set time. RP at 76-92; Comm'n Exs. 6-12, 15 (Municipal Court of Sumner Docket Record of Proceedings summarizing the penalties imposed on various Hispanic defendants included enrollment in an English course and becoming legal); Comm'n App. 19, at 1. Judge Hammermaster sometimes threatened Hispanic defendants with immediate deportation.
Although Judge Hammermaster testified that he has told defendants to leave the country, he also admitted that he was aware that he did not have the authority to order defendants to leave the country immediately and that such remarks were wrong. When asked why he frequently asked Hispanic defendants about their legal status, Judge Hammermaster testified that he asked those questions as part of the sentencing process. Judge Hammermaster could not explain the relevancy of the legal status of Hispanic defendants. He stated his questions were based on a "gut instinct" that the defendant was illegally in the United States, though occasionally a person's inability to speak English would also prompt him. RP at 76-85.

Analysis
The Washington State Constitution establishes a commission on judicial conduct and empowers the commission to investigate complaints against judicial officers, conduct hearings, make recommendations for discipline to the Supreme Court, and to establish rules of procedure for commission proceedings. Const. art. IV, § 31 (amend.77); In re Disciplinary Proceeding Against Buchanan, 100 Wash.2d 396, 399, 669 P.2d 1248 (1983). Further, the constitution provides:
The supreme court may censure, suspend, or remove a judge or justice for violating a rule of judicial conduct....
....
The supreme court may not discipline or retire a judge or justice until the commission on judicial conduct recommends after notice and hearing that action be taken and the supreme court conducts a hearing, after notice, to review commission proceedings and findings against a judge or justice.
Const. art. IV, § 31 (amend.77).
The Commission bears the burden of proving the alleged ethical violations by clear, cogent, and convincing evidence. In re Disciplinary Proceeding Against Sanders, 135 Wash.2d 175, 181, 955 P.2d 369 (1998); CJC RP 7. Our review of the CJC's judicial disciplinary proceedings is de novo. In re Disciplinary Proceedings Against Anderson, 138 Wash.2d 830, ____, 981 P.2d 426, 432 (1999); In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 87-89, 736 P.2d 639, 744 P.2d 340 (1987). This requires an independent evaluation of the record; the Commission's findings or conclusions do not bind us. In re Anderson, 138 Wash.2d at ____, 981 P.2d at 432; In re Disciplinary Proceedings Against Turco, 137 Wash.2d 227, 246, 970 P.2d 731 (1999); DRJ 9(c). This Court gives considerable weight to credibility determinations made by the Commission and serious consideration to the Commission's recommended sanctions. In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967 (1994). But the constitution's use of the word "recommend" indicates an intent to place the ultimate decision to discipline in the Supreme Court. Deming, 108 Wash.2d at 88, 736 P.2d 639.
The Commission in this case found that Judge Hammermaster's conduct, as outlined above, violated Canons 2(A), 3(A)(1) and 3(A)(3). Although the judge does not dispute that he engaged in the alleged conduct, he argues that the Commission has failed to demonstrate, by clear, cogent, and convincing evidence, that such conduct demonstrated a pattern of misconduct violative of Canons 2 and 3. We disagree.
Canon 2(A) states:
Judges should respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Canon 3(A)(1) states:
Judges should be faithful to the law and maintain professional competence in it. Judges should be unswayed by partisan *935 interests, public clamor, or fear of criticism.
Canon 3(A)(3) states:
Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in their official capacity, and should require similar conduct of lawyers, and of the staff, court officials, and others subject to their direction and control.
The Comment which accompanies Canon 3(A)(3) explains:
The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and business-like while being patient and deliberate.
A. Improper threats of life imprisonment
The Commission found that in 12 cases, Judge Hammermaster's threats of life imprisonment or indefinite jail sentences constituted a pattern and practice violating Canons 2(A), 3(A)(1) and 3(A)(3).
Judge Hammermaster argues that his comments were reasonable given their context. The defendants were back before his court for failing to comply with sentencing obligations. Judge Hammermaster claims that he made those remarks as a technique of obvious exaggeration, in order to alert the defendants to the serious consequences of their actions. While Judge Hammermaster admits he does not have the authority to impose life sentences or indefinite jail sentences, he apparently believes he has the statutory authority to impose an extended jail sentence for a defendant who fails to pay fines.[8] RP at 60-61. Ultimately, Judge Hammermaster defends his conduct on grounds that a judge is entitled to latitude in dealing with defendants and that his statements were a reasonable exercise of judicial independence.
Although we agree that a judge must have latitude when speaking with defendants, Judge Hammermaster's practice of consistently intimidating defendants with life imprisonment or indefinite jail sentences falls outside the bounds of such latitude. The record belies his assertion that his comments were mere rhetoric and were intended to alert defendants of the consequences of nonpayment of fines. His repeated statements that appear to break down the daily, weekly, monthly, and yearly accumulation of fines had no use other than to bully defendants, some of whom were very apologetic and confused by Judge Hammermaster's remarks. See, e.g., Lybeck, No. 5382. As this Court noted in In re Deming, "threats of improper sentencing do not befit the dignity of our judicial system." In re Deming, 108 Wash.2d at 117, 736 P.2d 639. While a judge is entitled to latitude in discussions with defendants, using threats which exceed judicial authority is unacceptable, even if the judge believes such threats are the only way to coerce compliance. In re Sadofski, 98 N.J. 434, 440, 487 A.2d 700 (1985) (improper threats of imprisonment constitute misconduct regardless of judge's belief that threats are the only effective means to communicate or method of securing compliance).
Judge Hammermaster also defends his conduct as an exercise of judicial independence. This argument misses the mark and demonstrates a misunderstanding of that concept. In the traditional sense, the concept of an independent judiciary refers to the need for a separation between the judicial branch and the legislative and executive branches. As Alexander Hamilton observed in The Federalist No. 78:
There is no liberty, if the power of judging be not separated from the legislative and executive powers ... the complete independence of the courts of justice is particularly essential in a limited constitution.
The Federalist No. 78, at 402 (Alexander Hamilton) (George W. Carey & James McClellan eds., 1990).
Underlying the concept of judicial independence is the belief held by the framers over 200 years ago that an independent judiciary *936 is an essential tool in guarding the constitution and the rights of individuals. As the Supreme Court said of the judiciary nearly one hundred and thirty years ago:
It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. This provision of the law is not for the protection or benefit of a ... judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences.
Bradley v. Fisher, 13 Wall. 335, 80 U.S. 335, 349 n. 16, 20 L.Ed. 646 (1871).
Judicial independence does not equate to unbridled discretion to bully and threaten, to disregard the requirements of the law, or to ignore the constitutional rights of defendants. While a judge must insist on compliance with his or her judgments, in this case Judge Hammermaster's threats, coupled with his failure to ascertain the defendants' ability to pay, demonstrate the judge exceeded his role as judge. A judge's primary function is the administration of justice, not the collection of fines.
Judge Hammermaster additionally asserts that if the Commission's decision is allowed to stand the "judicial independence of the courts of this state will be threatened." Opening Br. of Resp't Judge at 35. Judicial independence requires a judge to commit to following the constitution, the statutes, common law principles, and precedent without intrusion from or intruding upon other branches of government. It does not refer to independence from judicial disciplinary bodies (or from higher courts). Decision making is constrained by the evidence, by appropriate procedural rules, records and legal principles. See Deanell Reece Tacha, Independence of the Judiciary for the Third Century, 46 Mercer L.Rev. 645 (1995). Judge Hammermaster's actions in the cases reviewed by the Commission demonstrate an unwillingness to follow the law or to protect the rights of those defendants appearing in front of him. His actions do not represent an exercise of judicial independence.
We agree with the Commission that Judge Hammermaster's improper threats are contrary to the directive of Canon 3(A)(3) that judges be patient, dignified, and courteous.
The judge's threats also demonstrate a failure to remain faithful to the law and maintain professional competence in violation of Canon 3(A)(1). Judge Hammermaster acknowledged that he lacked authority to impose the sentences he threatened. He also testified that he has never thought about the limits of his ability to make defendants pay fines. Although the judge acknowledged there are limits on his sentencing authority, he does not know what the limits are. Judge Hammermaster has been a municipal court judge for 30 years. A large percentage of the business of such courts involves traffic violations and the imposition of fines. Under these circumstances, the judge's ignorance and disregard for the limits of his authority is particularly disturbing.
We also agree with the Commission that the judge's threats of life imprisonment or indefinite jail sentences undermine public confidence in the judiciary in violation of Canon 2(A). For most citizens, appearing as witnesses, spectators, or defendants in municipal court is their only contact with the judicial system. A 1998 comparison of case loads between the superior courts and the district and municipal courts reveals that the lower courts considered 2,154,748 cases as compared with 280,682 cases considered by the superior courts of this State. Office of the Administrator of the Courts, Caseloads of the Courts of Washington (1998). The impressions which individuals involved in court proceedings receive help form their opinion of our justice system and of the manner in which our laws are enforced. It is a judge's duty to see that the opinion is one of confidence and respect. In re Yengo, 72 N.J. 425, 433, 371 A.2d 41 (1977) (discussing importance of municipal courts on public's perception of judicial system). The defendants in the cases at issue were not represented by counsel. People appearing pro se and without legal training are the ones least able to defend themselves against rude, intimidating, or incompetent judges. The conduct here *937 denigrates the public view of municipal courts as places of justice. Id. at 57.
B. Denial of basic due process in taking guilty pleas
The Commission found that Respondent's method of accepting guilty pleas failed to comply with the requirements of due process and CrRLJ 4.2, and constituted a pattern and practice violating Canon 3(A)(1). CD at 4-5. Judge Hammermaster does not dispute that he accepted guilty pleas without first determining whether the guilty pleas were knowing, intelligent, and voluntary. Judge Hammermaster claims, however, that he was acting in the good faith belief that his use of the guilty plea form in combination with the information sent to a defendant regarding his or her rights and court procedures substantially complied with the law. He also relies on the fact that prosecutors and defense attorneys had input in drafting the form and that no attorney ever complained about his method of taking pleas. Finally, the judge argues that his process, which is subject to appellate review, has never been reversed. He reasons that judicial discipline is inappropriate because an appeal is available to correct any legal error in the taking of guilty pleas. Again, we disagree.
The law is clear that a judge has a duty to ensure that guilty pleas are knowingly, voluntarily, and intelligently made. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). At a minimum, this requires the defendant be apprised of the essential elements of the offense as well as any mandatory minimum sentence and the statutory maximum. State v. Holsworth, 93 Wash.2d 148, 607 P.2d 845 (1980). In addition, CrRLJ 4.2 sets out the information to be included in a guilty plea form.
There is no question that Respondent's method of accepting guilty pleas is defective. Judge Hammermaster failed to explain the nature of the charges and the potential consequences, in either his colloquy with defendants or in the written forms he required defendants to sign. See, e.g., Amburgy, No. C00010460. Further, the additional procedural information mailed to the defendants was not tailored to the particular defendant and therefore did not advise the defendant of the requisite information. In his colloquy the judge did not determine whether the defendants had received or read the court information pamphlet. In testimony the judge stated his belief that he is only required to explain the minimum and maximum penalties if he is asked to do so. That is not so. Moreover, even in response to direct questions about the consequences of a guilty plea, the judge declined to provide the information and, in one case, became hostile. See, e.g., Cebula, No. C00000189; Potter, No. C00010615.
Neither Judge Hammermaster's good faith belief nor his misguided reliance on attorneys can excuse the deprivation of constitutional rights which resulted from the judge's conduct. Judge Hammermaster testified that as a municipal court judge, he has presided over thousands of cases. In light of this fact, his continued acceptance of defective guilty pleas makes his conduct even more egregious. Judge Hammermaster's reliance on other attorneys for validation of his guilty plea forms cannot excuse his duty to be faithful to the law and to maintain professional competence.
Other states have held that a judge's failure to honor the basic rights of defendants is evidence of judicial misconduct. In re Reeves, 63 N.Y.2d 105, 480 N.Y.S.2d 463, 469 N.E.2d 1321 (1984); In re Field, 281 Or. 623, 576 P.2d 348 (1978); Ryan v. Commission on Judicial Performance, 45 Cal.3d 518, 754 P.2d 724, 247 Cal.Rptr. 378, 76 A.L.R.4th 951 (1988). A judge's action need not be undertaken in bad faith or malice. Discipline may be appropriate even though the judge acted out of neglect or ignorance. Mississippi Comm'n on Judicial Performance v. Hartzog, 646 So.2d 1319 (1994); Kloepfer v. Commission on Judicial Performance, 49 Cal.3d 826, 782 P.2d 239, 264 Cal.Rptr. 100, 89 A.L.R.4th 235 (1989). A judge has an affirmative duty to learn the relevant legal procedures of which he or she is ignorant. In re Inquiry Concerning a Judge, 265 Ga. 843, 462 S.E.2d 728 (1995); In re Hamel, 88 N.Y.2d 317, 668 N.E.2d 390, 645 N.Y.S.2d 419 (1996). As the Commission and Amicus Curiae ACLU point out, CrRLJ 4.2 provides a ready source for the requirements of written *938 guilty pleas. Additionally, case law explicitly sets forth requirements for a constitutional guilty plea.
The judge's argument that he cannot be disciplined because his decisions have not been overturned or appealed is similarly unpersuasive. The judge has the basic duty to ensure that courtroom practice conforms with the law. While we recognize that legal error is usually a matter for appeal and does not generally trigger judicial discipline, a repeated pattern of failing to protect a defendant's constitutional rights can constitute misconduct. In re Reeves, 63 N.Y.2d 105, 469 N.E.2d 1321, 480 N.Y.S.2d 463 (1984); In re Yengo, 72 N.J. 425, 371 A.2d 41 (1977); In re Seraphim, 97 Wis.2d 485, 294 N.W.2d 485 (1980). As the Michigan Supreme Court noted:
Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other. One path seeks to correct past prejudice to a particular party; the other seeks to prevent potential prejudice to future litigants and the judiciary in general.
In re Laster, 404 Mich. 449, 462, 274 N.W.2d 742 (1979). The record in this case establishes a pattern and practice of accepting guilty pleas in a manner which denied defendants basic due process rights. The Commission has met its burden of establishing this conduct violated Canon 3(A)(1) by clear, cogent and convincing evidence.
C. Trials in Absentia
The Commission found that Respondent's method of conducting trials in absentia constitutes a pattern and practice of violating defendants' basic due process rights, and is contrary to this Court's holdings in State v. Hammond, 121 Wash.2d 787, 854 P.2d 637 (1993) and State v. Jackson, 124 Wash.2d 359, 878 P.2d 453 (1994), constituting a violation of Canon 3(A)(1). As described above, Judge Hammermaster conducted trials in absentia by requiring defendants to sign a "not guilty" form at arraignment, which waived the rights to counsel, to a jury trial, and to be present at trial. Judge Hammermaster does not dispute the fact that since 1993, he has regularly held trials in absentia. Again, his defense to this charge is that he believed in good faith that his practice was in accordance with the law and that appeal, not judicial discipline, is the appropriate remedy to any error in his procedure. He believes that the last paragraph of the "not guilty" plea form he fashioned gave him authority to hold a trial without the defendant's presence:
If I am not in attendance at the time of trial, including the commencement thereof, it is because I have deliberately and intentionally refused to be present, and under such circumstances request that I be deemed "excused" by the court pursuant to CrRLJ 3.4.
Comm'n Ex. 2. He is mistaken about the significance of this form.
CrRLJ 3.4(a) provides that a defendant "shall" be present at trial unless "excused or excluded by the court for good cause shown." The rule also says the defendant's absence "after the trial has commenced" does not prevent it from continuing to verdict. CrRLJ 3.4(b). Thus, trial may not commence in the absence of the defendant regardless of his purported waiver of his right to be present. Jackson, 124 Wash.2d 359, 878 P.2d 453; Crosby v. United States, 506 U.S. 255, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993). In Jackson, the defendant appeared for several pretrial hearings but failed to appear for a competency hearing and for trial. The trial court held that the defendant had voluntarily absented himself and proceeded in absentia. This Court reversed, holding that CrR 3.4 permits trials to continue, not commence, in the defendant's absence.[9]
Even if the rule did permit trial to begin without the defendant, his absence would have to be knowing, intelligent, and voluntary. The language in Judge Hammermaster's form purports to be a request by the defendant that his or her absence at the time of trial be deemed excused. It is unlikely that a defendant who signs the form is aware that he or she is thereby waiving a constitutional *939 right and consenting to be tried in his or her absence. In fact, the records in two cases demonstrates that the defendants were confused that they had waived their right to be present at trial. In Potter, No. C00010615, for example, the defendant stated, "I wanted to plead not guilty, but I guess I have to [plead guilty] if you guys went ahead to the trial with me not being there." Additionally, the defendants in all the cases reviewed were unrepresented and their "permission" for trials in absentia was initiated by the judge. As Amicus ACLU points out, in order to assert the constitutional right to plead not guilty, the defendant is required to sign the form which essentially forces a waiver of other basic procedural rights, including the right to consult with counsel.
In short, the forms which the judge had a part in drafting are constitutionally defective in several respects. Under Canon 3(A)(1), Judge Hammermaster has a duty to ensure that he be faithful to the law and maintain professional competence. His habitual use of the "not guilty" forms that force defendants to waive basic procedural rights, and his treatment of at least two defendants who appeared before him after being tried in absentia, demonstrate the extent to which Judge Hammermaster is unwilling to faithfully adjudicate cases in accordance with the law.
We find that clear, cogent and convincing evidence supports the Commission's finding that Judge Hammermaster's practice of holding trials in absentia constituted a pattern and practice which violated Canon 3(A)(1).
D. Conduct that is not "patient, dignified, and courteous"
The Commission found that Respondent's various remarks to defendants constituted a pattern and practice that violated Canons 2(A), 3(A)(1) and 3(A)(3). CD at 6. Similar to his response to the Commission's first charge, Judge Hammermaster defends his conduct on grounds that a judge should have reasonable latitude when addressing defendants without the fear of being criticized.
Judge Hammermaster admits that the remarks he made to the defendant suffering from bipolar disorder and his various remarks regarding the unmarried relationship of defendants are routine in his courtroom. However, he also believes that his comments do not rise to the level of misconduct because they were not outrageous or vulgar. Further, he maintains that such rhetoric, similar to his remarks regarding life sentences, was used to alert defendants to the consequences of their actions. The judge testified that he believed he was getting through to defendants and that comments like the ones above are helpful to defendants. However, the record in the various cases does not indicate that defendants have reacted as positively as Judge Hammermaster believes.
Washington judicial discipline cases provide some guidance on the extent to which intemperate or rude remarks will constitute actionable conduct. In In re Thronson, No. 93-1548-F-45, Comm'n on Judicial Conduct (Aug. 5, 1994), the Commission considered a complaint of misconduct in a single case. There the judge called the defendant a "smart aleck," told him to "shut up before you go to jail" and lectured him on "being a loser." The judge stipulated that his conduct constituted a violation of Canons 1, 2(A), and 3(A)(3). In In re Warren, No. 95-2015-F-55, Comm'n on Judicial Conduct (Oct. 13, 1995), the Commission considered several cases involving inappropriate comments from the judge. Among other comments, the judge's remarks included the following:
[I]t's bullshit. This thing was sentenced on July 9, 1991. You've had 11 months and you have not paid a single dime to this man. You've screwed him....
....
In this country you use bathrooms. And if you can't use bathrooms, you go back to Morales.
....
[A]ll you're doing is making her look like like an idiot....
All I want to do is chew butt on Mr. Wybenga at the moment.
....
Now, if, Mr. Flores, she didn't post the money, deciding that she had some other good lookin' guy she'd rather spend the *940 time with, ah, if it wasn't posted you could certainly post it now.
....
All you've done to these courts is say, "screw you, judge" every time down the line, including ours from back in 1991....
In re the Matter of Warren, No. 95-2015-F-55, Comm'n on Judicial Conduct (Oct. 13, 1995). The Commission found, and the judge agreed, that this conduct violated Canons 1, 2(A), 3(A)(2) and 3(A)(3).
In In re Turco, a municipal court judge was disciplined for the remarks he made in the course of sentencing which demonstrated insensitivity to victims of domestic violence. In one case the judge stated, "[Y]ou didn't need to bite her. Maybe you needed to boot her in the rear end...." In another matter he told the defendant, "[F]ifty years ago I suppose they would have given you an award...." In another case he said, "[T]he police do 95% of the work when they separate the parties.... [A]ll we're doing is slapping someone after the police have remedied the situation." Turco, 137 Wash.2d at 252, 970 P.2d 731. The Commission found and the judge agreed that the remarks violated Canons 1, 2(A) and 3(A)(1)-(4).
This Court has also found offensive comments by judges both in and out of the courtroom have violated the Canons. In In re Deming, 108 Wash.2d 82, 736 P.2d 639, a district court judge was removed for attempting to enhance the position of a probation officer with whom he was personally involved. There the court also found that the judge's myriad of improper and offensive comments and sexual innuendoes to women were actionable misconduct. Deming, 108 Wash.2d at 110-17, 736 P.2d 639. The Court found that his behavior was inconsistent with service as a judge. Id. at 117, 736 P.2d 639.
Opinions from other states are also helpful. In Dodds v. Commission on Judicial Performance, 12 Cal.4th 163, 906 P.2d 1260, 48 Cal.Rptr.2d 106 (1995), the court found the appearance of rudeness and prejudgment by a Superior Court judge on four occasions relating to his conduct in presiding over settlement hearings to be "unjudicial." Id. at 172, 48 Cal.Rptr.2d 106, 906 P.2d 1260. The judge there argued that his "assertive" judicial style enabled him to effect settlement in difficult cases. Id. at 176, 48 Cal.Rptr.2d 106, 906 P.2d 1260. The California Supreme Court rejected his explanation, and held that "when a judge, clothed with the prestige and authority of his judicial office, repeatedly interrupts a litigant and yells angrily and without adequate provocation, the judge exceeds his proper role and casts disrepute on the judicial office." Id. at 177, 48 Cal.Rptr.2d 106, 906 P.2d 1260.
Considering the other conduct Judge Hammermaster has engaged in, his remarks are consistent with his tendency to bully and intimidate defendants. His repeated conduct shows that Judge Hammermaster fails to take seriously his duty to act patiently, and in a dignified and professional manner toward defendants. The record thus contains clear, cogent, and convincing evidence supporting the Commission's finding that Judge Hammermaster's various remarks to defendants constituted a pattern and practice that violated Canons 2(A), 3(A)(1) and 3(A)(3).
E. Ordering Hispanic defendants to leave the country
The Commission found that Judge Hammermaster routinely asked Hispanic defendants about their immigration status, ordered them to enroll in English courses, and/or ordered them to leave the country. CD at 3. Due to the ambiguity in the federal law regarding a nonimmigration court's authority to issue such orders, the Commission concluded that Judge Hammermaster had not violated any specific canon. The Commission did not separately address the allegation that the judge's conduct violated Canon 3(A)(3).
This Court is not bound by the Commission's decision. Turco, 137 Wash.2d at 246, 970 P.2d 731. Judge Hammermaster admitted that he routinely asks Hispanic defendants about their immigration status, and orders them to enroll in English classes, in addition to threatening them with deportation. See Ceras-Campos, No. XXXXXXXXX, C00010522; Aparicio-Zaldivar, No. C00010365. Respondent's testimony before the Commission on this issue provided no *941 reasonable explanation for his treatment of Hispanic defendants. He could not explain why he was concerned only with the citizenship of Hispanic defendants and not of other defendants.
Setting aside the question of whether a municipal court judge has the authority to order deportation under federal law, Judge Hammermaster's practice of inquiring only about the citizenship of Hispanic defendants raises serious concerns about Judge Hammermaster's motivation and undermines the public's confidence in the judiciary.
A 1999 national survey conducted by the National Center for State Courts questioning citizens about their view of state courts has revealed a significant issue regarding the perceptions of the justice system among minority respondents. Although the report found that "overall, people have a good deal of confidence in American institutions", confidence in those institutions varies systematically across racial groups with minority respondents expressing significantly less confidence. Nat'l Ctr. for State Courts, How the Public Views the State Courts: A 1999 National Survey (1999).
A recent publication developed by the Washington State Office of the Administrator for the Courts under a grant from the State Justice Institute has summarized the issues relating to the Mexican immigrants in our courts.
Mexican immigrants come to the United States to face grossly incorrect perceptions, negative stereotypes, both malignant and benign prejudices, hostility, and antipathy. The history of U.S. aggression, the cycles of welcome and rejection of Mexican labor, the climate of suspicion and fear of immigrants and their children, and incidents of discriminatory behavior combine to reinforce the immigrants' need to exercise extreme caution in their interactions with U.S. institutions and individuals of authority. The sheer numbers of Mexican immigrants in the United States and their great diversity assure that they will, with increasing frequency, come into contact with the U.S. courts, as plaintiffs, defendants, witnesses, or subjects of actions. It is incumbent upon personnel in the courtslaw officers, clerks, attorneys, mediators, arbitrators, and judgesto assure that all have equal access to justice. In the case of Mexican immigrantsespecially those from rural Mexicoadditional effort probably will be required to assure access and equal protection.
Juan-Vicente Palerm et al., Mexican Immigrants in Courts, Immigrants in Courts 96, (Joanne I. Moore, ed., 1999).
Judge Hammermaster's treatment of Hispanic defendants described above falls far below the levels of dignity and respect litigants have a right to expect from judges. We find this conduct constitutes a pattern and practice that violates Canon 3(A)(3).

Sanctions
A majority of the Commission ordered censure of Judge Hammermaster, and ordered that he take a corrective course of action by completing judicial education courses in ethics, criminal procedure, and diversity, in addition to meeting with a judicial mentor, paid for at his own expense and approved in advance by the Commission. CD at 8. The Commission also ordered that Judge Hammermaster's conduct be monitored by the Commission, in a manner prescribed by the Commission, for a period of two years. Id. Additionally, the Commission recommended that this Court impose a sanction of suspension for 30 days without pay. Id. Judge Hammermaster urges that a sanction is not appropriate in his case.
This Court must consider 10 factors when imposing sanctions for judicial misconduct:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been *942 prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
In re Matter of Deming, 108 Wash.2d at 119-20, 736 P.2d 639. As outlined above, Judge Hammermaster is guilty of a pattern or practice of misconduct, committed in the courtroom, in his official capacity. Although he admits the actions, he does not acknowledge their impropriety or the adverse effect they have on the integrity of and respect for the judiciary. Nor, therefore, has he made any effort to change his behavior (though he may be willing to do so in the future).
In considering the level of discipline, the Commission considered some of these factors but also found several mitigating circumstances: Judge Hammermaster did not exploit his judicial position to satisfy personal desires, he is willing to change his behavior, no prior disciplinary action has been taken against him during his 30 years of service, and he fully cooperated with the Commission's investigation.
We do not agree that these factors are so mitigating as to justify only a 30-day suspension. The Code of Judicial Conduct, particularly Canons 2(A), 3(A)(1) and 3(A)(3), requires judges to be faithful to the law, to maintain professional competence, and to act in a manner that is patient, dignified, and courteous toward defendants. Judge Hammermaster violated all of these obligations by demonstrating a pattern of intimidating and offensive behavior, ignorance or disregard of basic legal principles, particularly in regard to sentencing and an ambivalence toward maintaining professional competence in his courtroom.
As we observed earlier, courts of limited jurisdiction perform an important function and their impact on Washington citizens is great. In days gone by, these courts were frequently termed police courts or justice courts, often presided over by justices of the peace or non-lawyer judges. See Laws of 1961, ch. 299, § 15. Now these courts are on the record and presided over by professional judges and have achieved important strides in gaining the confidence of the community. To maintain and enhance that confidence the judges of these courts must meet the high standards expected of all members of the judiciary. Judge Hammermaster's conduct fails to meet those standards. We find that the Commission's recommended 30 day suspension is insufficient to restore public confidence. Judge Hammermaster's conduct has significantly damaged the credibility of the courts of justice.
There are few cases in Washington with which to compare the judge's conduct. In Warren, No. 95-2015-F-55, the judge made several inappropriate comments to defendants. Most occurred at arraignment to persons who were unrepresented. The Commission reprimanded the judge and required completion of a cultural diversity program. As distinguished from this case there was no allegation that the judge threatened unlawful sentences or attempted to deprive defendants of basic constitutional rights. Similarly, in In re Thronson, No. 93-1548-F-45, the Commission admonished a pro-tem judge for inappropriate remarks in a single case.
Although prior cases decided by the Commission and this Court offer little for comparison, there are a few cases from other states involving conduct similar to Judge Hammermaster's. In a majority of these cases the judge was removed from office. For example, Sardino v. Commission on Judicial Conduct, 58 N.Y.2d 286, 448 N.E.2d 83, 461 N.Y.S.2d 229 (1983) involved the removal of a judge who routinely denied criminal defendants their rights, ignored the mandates of law, disregarded the jurisdiction of other courts, disparaged attorneys, demeaned defendants and generally acted in a manner which discredited the court. In another case the Oregon Supreme Court ordered the removal of a judge for general incompetent performance of judicial duties and disregard for the statutory and constitutional rights of defendants. In re Field, 281 Or. 623, 576 P.2d 348 (1978). Removal was also ordered in In re Inquiry Concerning a Judge, 265 Ga. 843, 462 S.E.2d 728 (1995) where the judge refused to issue mandatory appeal bonds, issued warrants unsupported by probable cause, and forced a defendant to enter a plea without his attorney. The case *943 for removal in the cases above was more compelling than in this one. In Sardino, for example, in addition to his consistent failure to inform accuseds of their right to counsel or to inform them of their rights at arraignment, the judge refused to set bail, even where required by law, and ordered defendants held for mental examinations without cause. In In re Field, the court found the judge's conduct stemmed from mental health problems, which could not be brought under control, even with professional help. And the conduct of the judge in In re Inquiry Concerning a Judge included issuance of warrants without probable cause in addition to his disregard for basic constitutional rights.
Judge Hammermaster's conduct involved more than the rude and inappropriate remarks in Warren and Thronson, but was not as egregious as the conduct in the cases outlined above. Nevertheless, we are persuaded that his actions demand a very serious sanction. Therefore, we order Judge Hammermaster suspended for six months without pay.
We uphold the Commission's order of a corrective course of action with the exception of the Commission's order that Judge Hammermaster pay for the judicial education courses. The purpose of completing the recommended courses is to educate Judge Hammermaster and modify his behavior. In view of Judge Hammermaster's part-time status as a municipal court judge and his willingness to change his behavior, he is free to request assistance in paying for the required education from his employers, Sumner, Orting, and South Prairie.
GUY, C.J., SMITH, JOHNSON, ALEXANDER, TALMADGE, IRELAND, JJ., and AGID, J.P.T., concur.
TALMADGE, J. (concurring).
I agree with the majority's disposition of this case, both as to Judge Hammermaster's culpability under the Code of Judicial Conduct and the sanction for his violations of the Code. I write separately to emphasize my views on the operation of some courts of limited jurisdiction in the state of Washington.
Justice Madsen appropriately notes in the majority opinion that concerns have arisen regarding the independence of courts of limited jurisdiction, particularly municipal courts, in our state. Indeed, in this case, involvement of the City executive authorities in the development of Judge Hammermaster's "rules" creates separation of powers and judicial independence concerns.
Our opinion today conveys a very strong message to the judiciary and local governments in Washington that the Supreme Court will not tolerate short cuts in due process. While many municipalities have established municipal courts because they want to administer justice locally, it is also true many jurisdictions establish municipal courts for purely avaricious reasonsas revenue agencies to be operated if they "make money" and be dispensed with if they become inconvenient to administer or generate insufficient revenues. See, e.g., Whatcom County v. City of Bellingham, 128 Wash.2d 537, 909 P.2d 1303 (1996) (upholding statutory limitation on ability of city to repeal municipal criminal code). Some local jurisdictions have even attempted to control performance of duties by municipal court judges through devices such as performance audits, the provision of substandard court facilities, or nonjudicial control of court personnel. Occasionally, in some jurisdictions, when the judge has been too independent and has refused to generate sufficient revenue for the municipality, the city's legislative or executive authorities have forced the ouster of the judge.
The Washington Supreme Court has inherent authority to supervise the administration of justice in the lower courts. We should strictly enforce the Code of Judicial Conduct in the operation of courts of limited jurisdiction. Moreover, we must not condone any derogation of the independence of the judicial branch of government by officials intent on revenue collection; we should not permit our courts to degenerate into collection agencies for local government at the expense of due process of law.
NOTES
[1] The Statement of Charges against Judge Hammermaster indicated that prior to initiating formal proceedings, the Commission had twice amended the Statement of Allegations. The first statement was served on Respondent Judge May 14, 1997. The Commission amended it on August 1, 1997, and again for the second time on April 22, 1998.
[2] Finding of Fact 3(a) relates to City of Sumner v. Amburgy, No. C00010460 discussed infra.
[3] For the offense of driving with a suspended or revoked driver's license, for example, which make up many of the cases referred to by the Commission, RCW 46.20.342(1)(a) provides that the sentencing range for persons convicted under the statute ranges from 10 days to 180 days.
[4] Judge Hammermaster testified that he has used this form in hundreds of cases.
[5] The judge testified that this colloquy is illustrative of the typical colloquy between him and a defendant on a plea of guilty in hundreds of cases.
[6] Comm'n Ex. at 3.
[7] Comm'n Ex. at 2.
[8] See, e.g., RCW 10.01.180 allowing for the commitment of defaulting defendant on grounds of contempt of court; RCW 10.82.030 allowing imprisonment until amount of fine and costs paid; RCW 10.01.160 allowing costs of incarceration to be imposed against defendant.
[9] CrRLJ 3.4 and CrR 3.4 are the same.