[No. J.D. 12.   En Banc.]

Argued December 17, 1997.     Decided April 28, 1998.

*In the Matter of the Disciplinary Proceeding Against* RICHARD B. SANDERS, *as Justice of the Supreme Court.*

*Preston Gates & Ellis,* by *Paul J. Lawrence,* for Justice Sanders.

*Tonkon, Torp, Galen, Marmaduke & Booth,* by *Peter H. Koehler, Jr. (Donald H. Marmaduke* and *Steven Wilker,* of counsel), for the Commission on Judicial Conduct.

GROSSE, J.* — A Justice of the State Supreme Court, as any judge, is required to maintain the appearance of impartiality. Doing so is oftentimes difficult, and requires significant restraint by the judicial officer when it comes to public appearances and remarks, particularly with respect to subjects and subject matter that are the focus of widespread public debate and controversy. In this case, the Washington Commission on Judicial Conduct determined that Justice Richard B. Sanders did not exercise sufficient restraint. We hold, however, that what Justice Sanders did and said at a March for Life rally on the day of his official swearing-in does not rise to a level permitting sanction, at least not on this record and not consistent with Justice Sanders' legitimate expectations under the state and federal constitutions.

Judges do not forfeit the right to freedom of speech when they assume office. They do agree, however, that the right must be balanced against the public's legitimate expectations of judicial impartiality. But the constitutional concern weighs more heavily in that balance, requiring clear and convincing evidence of speech or conduct that casts doubt on a judge's integrity, independence, or impartiality in order to justify placing a restriction on that right.

Justice Sanders' brief appearance at the rally to express his belief in the preservation and protection of innocent

---

*Judge C. Kenneth Grosse and each member of the panel are serving as justices pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend. 38) and Discipline Rules for Judges (DRJ) 13.

human life and to thank his supporters in the crowd for his election to office does not lead to a clear conclusion that he was, as a result, not impartial on the issue as it might present itself to him in his role as a judge.

## FACTS

Justice Sanders was elected to the Washington Supreme Court in November 1995. His formal swearing-in ceremony took place at the Temple of Justice building on the state capitol campus in Olympia on January 26, 1996. On the same day, the organization "Washington State March for Life" (March for Life) held its annual rally in Olympia. March for Life is an organization composed of people who are opposed to abortion. During the rally, the group marched by the Temple of Justice and ended up at the steps of the Legislative Building, where various speakers, including a bipartisan collection of state legislators, addressed the crowd.

A few days prior to January 26, Justice Sanders telephoned Kenneth VanDerhoef, a close friend and president of Human Life of Washington, an organization opposed to abortion. Justice Sanders told VanDerhoef that he planned to attend the March for Life rally and wanted to address those in attendance. Justice Sanders knew at the time he sought an opportunity to speak at the rally that there was a "political aspect" to the abortion issue as well as a "moral aspect." When later asked whether he had taken any steps to determine whether the rally would be in support of electing pro-life legislators or passing pro-life legislation, Justice Sanders responded that he "didn't do a great deal of research about this," but rather only read March for Life's advertisement and spoke to VanDerhoef. This advertisement invited members of the public to participate in the rally and to "join and witness all life is sacred." The advertisement urged those who came to "Carry a red rose, 'the pro-life symbol.' "

At the conclusion of his swearing-in ceremony, Justice

Sanders walked to the rally which was underway at the steps of the Legislative Building. According to Justice Sanders, he carried a red rose because the sponsors had asked participants to carry one, in his estimation, "to identify themselves as a participant in the event."

When he arrived at the rally, Justice Sanders was introduced as a Chief Justice by Katherine McEntee, the president of March for Life. Justice Sanders took the podium and addressed the crowd, still carrying the red rose. The full text of his address is as follows:

> Well, I'm not quite Chief Justice, but I am a Justice. That's plenty good enough for me. I want to give all of you my best wishes in this celebration of human life. Nothing is, nor should be, more fundamental in our legal system than the preservation and protection of innocent human life. By coincidence, or perhaps by providence, my formal induction to the Washington State Supreme Court occurred about an hour ago. I owe my election to many of the people who are here today and I'm here to say thank you very much and good luck. Our mutual pursuit of justice requires a lifetime of dedication and courage. Keep up the good work.

Justice Sanders left the gathering immediately after he addressed the crowd.

The Washington Commission on Judicial Conduct (CJC) conducted an investigation into Justice Sanders' appearance at the March for Life rally and, on December 3, 1996, served him with a Statement of Charges. The CJC determined that probable cause existed to believe that Justice Sanders violated Canons 1, 2(A), 2(B), 7(A)(1), and 7(A)(5) of the Code of Judicial Conduct, and that his conduct was not permitted by Canons 4 or 5. After a fact-finding hearing, the CJC issued its decision. Among the facts the CJC found was that the March for Life event at which Justice Sanders spoke was a political rally. "Speakers urged those in attendance to work for the election of a pro-life governor and pro-life legislators. The enactment of pro-life legislation was also actively promoted." CJC Finding of Fact 5. The CJC also found:

[Justice Sanders'] actions went beyond the mere expression of his opinion. By his presence, his act of carrying the pro-life symbol (a red rose), and his statements he aligned himself with a particular organization involved in pursuing a political agenda. Respondent gave the appearance that he, a justice of the Washington State Supreme Court, supported the agenda advocated by March for Life. . . . [T]he statement was made during the course of a political rally wherein he spoke as a supporter of the cause.

CJC Finding of Fact 8.

The CJC concluded that Justice Sanders violated Canons 1, 2(B), and 7(A)(5) of the Code of Judicial Conduct and that his acts were not within the scope of either Canon 4 or 5. CJC Conclusions 2-5. The CJC considered several mitigating and aggravating factors and ordered that Justice Sanders be reprimanded and required to complete a course in judicial ethics.[1] Justice Sanders appeals.

## DISCUSSION

Standard of Review and Burden of Proof

■■ Our constitution confers the power to discipline a judge on the supreme court. Const. art. IV, § 31 (amend. 77). We review the CJC's decision de novo, *In re Stoker*, 118 Wn.2d 782, 793, 827 P.2d 986 (1992); *In re Kaiser*, 111 Wn.2d 275, 279, 759 P.2d 392 (1988), while giving considerable weight to the CJC's findings and recommendations. *In re Blauvelt*, 115 Wn.2d 735, 740 n.5, 801 P.2d 235 (1990); *Kaiser*, 111 Wn.2d at 279.

■ The burden of proof in judicial disciplinary proceedings is clear, cogent, and convincing evidence. *Kaiser*, 111 Wn.2d at 279; *In re Deming*, 108 Wn.2d 82, 109, 736 P.2d 639, 744 P.2d 340 (1987). Such evidence is "evidence which is weightier and more convincing than a preponderance of the evidence, but which need not reach the level of 'beyond a reasonable doubt.' " *Deming*, 108 Wn.2d at 109.

---

[1]One member of the CJC determined that an admonishment, rather than a reprimand, was the appropriate discipline, but in all other respects agreed with the majority's findings and conclusions.

## Canon 1

Canon 1 of the Code of Judicial Conduct provides:

> An independent and honorable judiciary is indispensable to justice in our society. Judges should participate in establishing, maintaining, and enforcing high standards of judicial conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

The CJC concluded that Justice Sanders "violated Canon 1 by failing to personally observe high standards of judicial conduct and by diminishing public confidence in the judiciary." CJC Conclusion 2. We cannot agree.

██ ██ In this case, we are called upon to balance a judge's First Amendment rights against the interests the Code of Judicial Conduct is aimed at protecting. These latter interests are set forth in Canon 1. Thus, Canon 1 establishes the dynamic tension that exists in the system into which judges are elected. That is, judges in Washington are elected officials and remain elected officials even after they take the oath of office. They are part of a political system, yet are forbidden from being, or appearing to be, partisan. They remain citizens who are entitled to enjoy the rights and freedoms guaranteed by the First Amendment, including the right to freedom of speech, yet are forbidden from being biased or partial, or appearing to lack impartiality.

To rely on Canon 1 as an independent basis for finding a violation of the Code under the circumstances of this case effectively begs the question presented. Canon 1 embodies the interests against which a judge's First Amendment rights must be balanced, but in this case it is these rights and interests that are in conflict. We therefore reverse the CJC to the extent it found that Justice Sanders committed an independent violation of Canon 1.

## Canon 7

If Canon 1 sets the conceptual framework for the constraints on judges, Canon 7 provides the more specific constraints, particularly as applied to the facts of this case.

Canon 7 of the Code of Judicial Conduct begins by enumerating specific types of "political conduct" in which judges or candidates for election to judicial office may not engage. Canon 7(A)(1)-(4). Canon 7(A)(5), which the CJC concluded Justice Sanders violated, provides: "Judges should not engage in any other political activity except on behalf of measures to improve the law, the legal system or the administration of justice."[2] The CJC concluded that

[2]Canon 7 in its entirety provides:

**(A) Political Conduct in General.**

(1) Judges or candidates for election to judicial office shall not:

    (a) act as leaders or hold any office in a political organization;

    (b) make speeches for a political organization or nonjudicial candidate or publicly endorse a nonjudicial candidate for public office;

    (c) solicit funds for or pay an assessment or make a contribution to a political organization or nonjudicial candidate;

    (d) attend political functions sponsored by political organizations or purchase tickets for political party dinners or other functions, except as authorized by Canon 7(A)(2);

    (e) identify themselves as members of a political party, except as necessary to vote in an election;

    (f) contribute to a political party, a political organization or nonjudicial candidate.

(2) During judicial campaigns, judges or candidates for election to judicial office may attend political gatherings, including functions sponsored by political organizations, and speak to such gatherings on their own behalf or that of another judicial candidate.

(3) Judges may contribute to, but shall not solicit funds for another judicial candidate.

(4) Judges shall resign from office when they become candidates either in a primary or in a general election for a nonjudicial office, except that they may continue to hold office while being a candidate for election to or serving as a delegate in a state constitutional convention, if they are otherwise permitted by law to do so.

(5) Judges should not engage in any other political activity except on behalf of measures to improve the law, the legal system or the administration of justice.

Justice Sanders "violated Canon 7(A)(5) by engaging in political activity other than to improve the law, the legal system, or the administration of justice." CJC Conclusion 4.

We have been urged to resolve this issue simply by making a determination as to whether Justice Sanders engaged

---

**(B)   Campaign Conduct.**

(1)   Candidates, including an incumbent judge, for a judicial office:

(a)   should maintain the dignity appropriate to judicial office, and should encourage members of their families to adhere to the same standards of political conduct that apply to them;

(b)   should prohibit public officials or employees subject to their direction or control from doing for them what they are prohibited from doing under this canon; and except to the extent authorized under Canon 7(B)(2) or (B)(3), they should not allow any other person to do for them what they are prohibited from doing under this canon;

(c)   should not

(i)   make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office;

(ii)   make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; or

(iii)   knowingly misrepresent the identity, qualifications, present position or other fact concerning the candidate or an opponent.

(2)   Candidates, including incumbent judges, for a judicial office that is filled by public election between competing candidates shall not personally solicit or accept campaign contributions. They may establish committees of responsible persons to secure and manage campaign funds and to obtain public statements of support. Such committees may solicit campaign contributions and public support from lawyers and others. Candidates' committees may solicit contributions no earlier than 120 days from the date when filing for that office is first permitted and no later than 60 days after the final election in which the candidate participated. Candidates shall not use or permit the use of campaign contributions for the private benefit of themselves or members of their families. Candidates shall comply with all laws requiring public disclosure of campaign finances, which may require knowledge of campaign contributions. When an unsolicited contribution is delivered directly to the candidate, receipt and prompt delivery of the contribution to the appropriate campaign official is not prohibited.

(3)   An incumbent judge who is a candidate for office without a competing candidate may obtain public support and campaign contributions in the manner provided in Canon 7(B)(2).

in political activity. For the reasons that follow, we find that this is an insufficient and inappropriate approach.

The Code of Judicial Conduct does not define the term "political activity." Much effort has been expended, both in the present case and by courts in prior cases, in attempting to identify what sort of conduct falls within subsection (5)'s prohibition of "political activity." In one such attempt, *In re Staples*, 105 Wn.2d 905, 910, 719 P.2d 558 (1986), the court refused to discipline Judge Staples for actively campaigning in favor of moving the county seat of Benton County from Prosser to Kennewick. Rather, it found that the judge's conduct fell squarely within the realm of political activity that is "on behalf of measures to improve the law, the legal system or the administration of justice," conduct that is expressly permitted under Canon 7(A)(5).[3] The court also stated that a judge's participation in "nonpartisan, civic-minded political activity" does not implicate the policy concerns underlying Canon 7(A)(5) and therefore does not fall within the canon's prohibition. *Staples*, 105 Wn.2d at 910.

■ ■ The court's statement in *Staples* that conduct is not "political" under Canon 7 if it is not partisan is not only dicta,[4] but it is also not helpful. Canon 7(A)(5)'s prohibition of engaging in political activity must be read in light of the directive in Canon 1 that judges act in furtherance of maintaining an impartial judiciary. The prohibition against engaging in other political activity cannot mean simply avoiding issues that divide neatly along traditional party lines. To do so would thwart efforts to fulfill the goals of Canon 1.

However, simply focusing on the "on behalf of measures to improve the law, the legal system and the administration of justice" language in Canon 7(A)(5) makes the identifica-

---

[3]At the time of the court's opinion in *Staples*, Canon 7(A)(5) was numbered Canon 7(A)(4).

[4]The court in *Staples* ultimately relied on the "on behalf of measures to improve the law, the legal system or the administration of justice" portion of Canon 7(A)(5) to dispose of the question presented to it.

tion of prohibited political activity an even more difficult task. To use that approach would mean the prohibition could never apply no matter how controversial the measure at issue.

Simply labeling activity or speech "political" or "not political" is an ineffective means of resolving the issues presented here, as amply illustrated by Judge Posner's opinion in *Buckley v. Illinois Judicial Inquiry Bd.*, 997 F.2d 224, 229 (7th Cir. 1993). At issue in that case was a proposal to add a proviso to the judicial canon prohibiting judicial candidates from announcing views "on disputed legal or political issues." The additional language of the proviso purported to allow the candidate to announce his or her views on measures to improve the law, the legal system, and the administration of justice, as long as the candidate did not cast doubt on his or her ability to impartially decide issues that would come before the court. Judge Posner opined that such a proviso gives with one hand and takes away with the other. *Buckley*, 997 F.2d at 229. That is, almost anything a judicial candidate could say about "improving the law" could be seen as casting doubt on his or her capacity to decide certain cases impartially.[5] Moreover, Judge Posner rejected the proposition that the canon could be saved by interpreting it to prohibit comment only on issues that are likely to come before the court, the very language of Washington's Canon 7(A)(5), at issue in this case: "There is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction." *Buckley*, 997 F.2d at 229. We find this analysis compelling.

We are cognizant of the fact that Judge Posner was concerned with restrictions on the conduct of a candidate for judicial office rather than the conduct of a sitting judge.

---

[5]An example offered by Judge Posner is illustrative: If the judge "announced boldly that he did not think juries should be used in most civil cases, he could be thought to be casting doubt on his capacity to preside impartially at civil jury trials, to rule on motions for directed verdict in such trials, to conduct a fair jury voir dire, to administer the rules of evidence in jury trials, and to decide on proposed jury instructions." *Buckley*, 997 F.2d at 229.

The distinction between a candidate for judicial office and a sitting judge is that the candidate has an additional attribute of free expression to weigh in the balance—that of the electorate's right to be informed. Nevertheless, we believe the opinion represents the best analysis of the ineffectiveness of merely applying the label "political" to a judge's activity or speech as a means to determine whether it is in violation of the canons. Moreover, Judge Posner's reasoning embraces as its touchstone recognition of the need to balance a judge's right to free expression against the public's interest in having judges impartially decide cases in accordance with the law. We see no different analysis as applicable here.

The foregoing illustrates the practical impossibility of arriving at a firm definition of "political activity" by which to evaluate the speech and conduct of judges and judicial candidates. A just resolution of the question of whether the CJC properly sanctioned Justice Sanders cannot be achieved by merely placing the label "political" or "not political" upon his activities and then approving or disapproving of them accordingly. Such an approach leaves unanswered the important question of whether the speech is nonetheless protected by the First Amendment, regardless of whether it is political or not political, controversial or not controversial, partisan or nonpartisan. The proper means by which to resolve the question presented is that utilized in *Buckley*, namely to identify those rights and interests at stake on both sides of the controversy and then to strike a balance between those rights and interests that conflict.

The competing interests at stake here are the government's interest in a fair and impartial judiciary, a judge's interest in the right to express his or her views, and the need for the free expression of those views in a system wherein members of the judiciary are elected to office by the vote of the people. The interest embodied in Canon 1 of the Code of Judicial Conduct calls upon judges to preserve the integrity and impartiality of the judiciary by establish-

ing, maintaining, and enforcing high standards of judicial conduct. Without question, this interest is compelling. *Kaiser*, 111 Wn.2d at 288 (quoting *Morial v. Judiciary Comm'n*, 565 F.2d 295, 302 (5th Cir. 1977) (" 'The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.' ")); *see also Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 848, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978) (Stewart, J., concurring) ("There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary.") (quoted in *Stretton v. Disciplinary Bd.*, 944 F.2d 137, 142 (3d Cir. 1991)); *J.C.J.D. v. R.J.C.R.*, 803 S.W.2d 953, 956 (Ky. 1991) ("There can be no question that the state has a compelling interest to protect and preserve the integrity and objectivity of the judicial system."). However, this interest must be measured against the interest of a judge in exercising his or her rights under the First Amendment to speak freely.

■ A judge does not surrender First Amendment rights upon becoming a member of the judiciary. *See Kaiser*, 111 Wn.2d at 284; *cf. In re Discipline of Donohoe*, 90 Wn.2d 173, 181, 580 P.2d 1093 (1978) (attorneys). Courts have frequently recognized the First Amendment rights possessed by a candidate for political office. For example, the United States Supreme Court has stated: "The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election[.]" *Buckley v. Valeo*, 424 U.S. 1, 52, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). Other courts have also recognized this. *See, e.g., American Civil Liberties v. Florida Bar*, 744 F. Supp. 1094, 1097 (N.D. Fla. 1990) "[A] person does not surrender his constitutional right to freedom of speech when he becomes a candidate for judicial office. A state cannot require so much."). We see no reason why the same principles should not apply to speech by a sitting judge, albeit with somewhat less force. In a system such as Washington's in which

judges are elected, they are, in effect, always seeking re-election. If a person does not completely surrender his or her right to freedom of speech upon becoming a candidate, then we cannot expect the candidate to do so once elected to judicial office.

◼ Each of these competing interests is of great significance. In the words of Judge Posner, "only a fanatic would suppose that one of the principles should give way completely to the other[.]" *Buckley*, 997 F.2d at 227. To permit the governmental interest in an impartial judiciary to prevent a judge from speaking on any issue that has proponents on both sides or that might come before the bench essentially gags the judge.[6] Thus, "the principle of impartial justice under law is strong enough to entitle government to restrict the freedom of speech of participants in the judicial process, . . . but not so strong as to place that process completely outside the scope of the constitutional guaranty of freedom of speech." *Id*. at 231.

◼ To achieve the requisite balance, the state must establish a compelling interest and demonstrate that any restriction is narrowly tailored to serve that interest. *Stretton*, 944 F.2d at 141; *see also Brown v. Hartlage*, 456 U.S. 45, 53-54, 102 S. Ct. 1523, 71 L. Ed. 2d 732 (1982) ("[T]he First Amendment surely requires that the restriction be

---

[6]In criticizing the reach of the canon prohibiting judicial candidates from announcing their views on "disputed legal or political issues," Judge Posner illustrated how it reached far beyond preventing only speech by which a candidate could compromise his or her impartiality and effectively gagged the judicial candidate:

> [The judicial candidate] can say nothing in public about his judicial philosophy; he cannot, for example, pledge himself to be a strict constructionist, or for that matter a legal realist. He cannot promise a better shake for indigent litigants or harried employers. He cannot criticize *Roe v. Wade*. He cannot express his views about substantive due process, economic rights, search and seizure, the war on drugs, the use of excessive force by police, the conditions of the prisons, or products liability—or for that matter about laissez-faire economics, race relations, the civil war in Yugoslavia, or the proper direction of health-care reform. All these are disputed legal or political issues.

*Buckley*, 997 F.2d at 228 (citation omitted). The same can be said about the overly broad reach of a canon imposing restrictions on the speech of sitting judges.

demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression."). Where, as here, a restriction not only affects the speaker's right to free speech, but also can result in disciplinary action to the speaker, the restriction must be subjected to even stricter scrutiny. *J.C.J.D. v. R.J.C.R.*, 803 S.W.2d at 955.

Justice Sanders has not challenged the constitutionality of the canons on their face, only as they have been applied to his conduct as reflected in the record of this case. Thus, the strict scrutiny required can be satisfied by clear and convincing evidence of conduct that threatened or compromised the integrity or appearance of impartiality of the judiciary. That burden of proof has not been met.

There is nothing in the record that would permit us to construe Justice Sanders' conduct as an express or implied promise to decide particular issues in a particular way, or as an indication that he would be unwilling or unable to be impartial and follow the law if faced with a case in which abortion issues were presented. And, notably, Justice Sanders did not remain at the rally after making his brief remarks and thus did not join the anti-abortionists in their support of the numerous legislators who spoke in favor of the passage of "pro-life" legislation and the attainment of a "pro-life" state government. Rather, he left immediately following his brief statement.

Canon 2

Canon 2(B) of the Code of Judicial Conduct provides:

> Judges should not allow family, social, or other relationships to influence their judicial conduct or judgment. Judges should not lend the prestige of judicial office to advance the private interests of the judge or others; nor should judges convey or permit others to convey the impression that they are in a special position to influence them. Judges should not testify voluntarily as character witnesses.

The CJC concluded that Justice Sanders "violated Canon

2(B) by improperly lending the prestige of his office to a particular organization engaged in advancing the interest of one side of a political controversy." CJC Conclusion 3. We cannot agree.

Most importantly, and similar to our view of the proper application of Canon 1, application of Canon 2 to a circumstance involving traditional concepts of free expression begs the very question at issue: What is the balance between the public's legitimate expectations of the judiciary's integrity and impartiality, whether financial or ideological, and the judge's right to free expression? In this circumstance, Canon 2 does no more than express particularized concerns more generally expressed in the broad principles of Canon 1.

While we do not reach the issue, we also question whether Canon 2(B) applies at all to the facts of the present case. The acts of Justice Sanders at issue here do not appear to fall within the type of conduct at which Canon 2(B) is directed. The canon addresses a judge's use of his or her office to obtain a financial or other advantage, either for himself or herself personally or for a third party. The comments to the canon in the American Bar Association MODEL CODE OF JUDICIAL CONDUCT illustrate this. They state that it would be a violation of Canon 2(B) "for a judge to allude to his or her judgeship to gain a personal advantage such as deferential treatment when stopped by a police officer for a traffic offense. Similarly, judicial letterhead must not be used for conducting a judge's personal business." Comment to Canon 2(B), ABA MODEL CODE OF JUDICIAL CONDUCT (1990). The canon also applies to the conduct of a judge lending the prestige of judicial office for the advancement of the private interests of others. Thus, "a judge must not use the judge's judicial position to gain advantage in a civil suit involving a member of the judge's family. In contracts for publication of a judge's writings, a judge should retain control over the advertising to avoid exploitation of the judge's office." *Id*. The canon also prohibits a

judge from initiating the communication of information to a sentencing judge or probation or corrections officer. Comment to Canon 2(B), ABA Code of Judicial Conduct.

Decisions of courts that have construed this canon provide additional illustrations of the type of conduct prohibited by Canon 2. For example, the court in *In re Kiley*, 74 N.Y.2d 364, 546 N.E.2d 916, 547 N.Y.S.2d 623 (1989), found that a judge violated this canon by speaking to an assistant district attorney regarding the disposition of a case in which the judge's friend was the defendant and explaining to the assistant district attorney the friend's life circumstances. In *Wilson v. Judicial Retirement & Removal Comm'n*, 673 S.W.2d 426 (Ky. 1984), the court found a violation based on a judge's use of his judicial office to benefit a close friend by improperly signing a temporary restraining order to prevent the seizure of the friend's property. And, in *In re Murray*, 92 N.J. 567, 458 A.2d 116 (1983), a part-time municipal judge was found to have violated Canon 2(B) (and Canon 1) by sending a letter to another judge seeking preferential treatment for his former clients.

The foregoing demonstrate that speaking at a rally such as March for Life in the manner in which Justice Sanders spoke is arguably not the sort of conduct at which Canon 2(B) is aimed. A judge's appearance and speech at a rally is not sufficiently akin to a judge's use of his or her judgeship to gain an economic or other advantage, either for themselves or for another individual, such as, for example, the dismissal of a traffic ticket or the granting of parole or a more lenient sentence, so as to allow Canon 2 to serve as a basis for sanctioning Justice Sanders.

A judge's right of free speech is subject to limitation by the Canons of Judicial Conduct. However, those limitations must not be interpreted in the individual case to go so far as to permit sanctioning speech and conduct that does not clearly and convincingly lead to the conclusion that the words and actions call into question the integrity and impartiality of the judge. The conduct in this case, briefly

appearing at a rally to thank supporters and to express a belief in the sanctity of human life, does not rise to that level.

The decision of the Judicial Conduct Commission is reversed.[7]

WEBSTER, BAKER, KENNEDY, SWEENEY, HOUGHTON, BECKER, BRIDGEWATER, and HUNT, JJ. Pro Tem., concur.

---

[7]Because of our disposition of these issues, we decline to address Justice Sanders' arguments that Canon 1 and Canon 7(A)(5) are unconstitutionally vague, or his argument that the CJC erred by denying him access to discovery and certain other information he claims was necessary for him to receive a fair hearing. With respect to the latter argument, we note that Justice Sanders failed to raise these issues at the time he filed his appeal from the CJC's decision and failed, both at that point in the proceedings and during oral argument before this court, to demonstrate any prejudice to him arising from the alleged error by the CJC with respect to the discovery matters.