**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILED
SUPREME COURT
STATE OF WASHINGTON
2/11/2022
BY ERIN L. LENNON
CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| In the Matter of | No. 201,996-0 |
|---|---|
| The Honorable David S. Keenan Superior Court Judge for King County. | ORDER AMENDING OPINION |

It is hereby ordered that the majority opinion of Gordon McCloud, J., filed February 10, 2022, in the above entitled case is amended as indicated below. All references are to the slip opinion.

On page 24, line 18, after "The" delete "Office of Disciplinary Council (ODC)" and insert "Commission".

On page 25, line 7, after "The" delete "ODC's" and insert "Commission's".

DATED this 11th day of February, 2022.

_____
Chief Justice

González, C.J.

APPROVED:

_____
Gordon McCloud, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 10, 2022

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 10, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of<br><br>The Honorable David S. Keenan<br>Superior Court Judge for King County. | NO.   201,996-0<br><br>EN BANC<br><br>Filed: February 10, 2022 |

GORDON McCLOUD, J.—The Commission on Judicial Conduct (Commission) ruled that Judge David S. Keenan, a King County Superior Court judge, violated the Code of Judicial Conduct (CJC or Code) when he approved a bus advertisement for North Seattle College. The ad pictured him and stated, in part, "A Superior Court Judge, David Keenan got into law in part to advocate for marginalized communities." North Seattle College is a nonprofit community college where Judge Keenan received both his high school and his associate's degrees. The ad ran for three weeks as part of North Seattle College's fall enrollment campaign.

Judge Keenan's conduct did not violate Rules 1.1, 1.2, or 1.3 of the Code. He did not violate his duty to be, and to appear, impartial, and he did not abuse the prestige of his office. We therefore reverse the Commission's decision and dismiss the charges.

No. 201,996-0

FACTS AND PROCEDURAL HISTORY

I.      JUDGE KEENAN APPEARED IN A BUS AD FOR NORTH SEATTLE COLLEGE

Judge Keenan graduated from North Seattle College (previously North Seattle Community College). Comm'n Ex. D-2-102, at 5 (Resp. to Statement of Allegations (RSA)), Ex. A-14, at 2 (Commission Decision & Order (Order)). Judge Keenan grew up in poverty, was a juvenile defendant in King County Superior Court, and eventually dropped out of high school. RSA at 3. At the age of 17, he was working at a fast food job when he decided to take the GED (general education degree) exam through North Seattle College. *Id.* He did so well on the exam that the dean of student development wrote to Judge Keenan and encouraged him to continue his education. *Id.* at 3-4.

Judge Keenan went on to study for his high school diploma through the college's "Adult High School Completion Program." RSA at 5; Order at 2. He then began working toward his two-year degree at the college, attending classes during the day and working full-time at night as a security guard. RSA at 5. After graduating with his two-year degree from North Seattle College, he transferred to the University of Washington and eventually earned his law degree from Seattle University. RSA at 5; Comm'n Ex. A-9, at 30 (Joint Statement of Evidence (JSE)). Judge Keenan was elected to his position as a judge on the King County Superior Court in November 2016 and was reelected in 2020. JSE at 1; Comm'n Ex. C-1, at

2

No. 201,996-0

67 (Transcript of Proceedings (TP)). Judge Keenan has a long history of doing free, or pro bono, legal work and he remains involved with North Seattle College. JSE at 31-32; Order at 2; RSA at 6.

In July 2019, a staff member at North Seattle College asked Judge Keenan to appear in a bus ad for the college as part of their student recruitment campaign aimed at increasing enrollment. JSE at 2; Order at 2-3. The ad was scheduled to run for roughly three weeks. TP at 66. Judge Keenan reviewed Canons 3 and 1 of the Code and he reviewed the Ethics Advisory Opinions (EAOs), but he did not contact the Ethics Advisory Committee (Committee) or the Commission to get an opinion on whether the ad violated the rules. TP at 59, 79; Order at 3. Judge Keenan approved the ad, and it ran in conjunction with an ad featuring a scientist, who also graduated from the college:



A Superior Court Judge, David Keenan got into law in part to advocate for marginalized communities.

David's changing the world. **He started at North**.



**Bright futures start here—with you.**
Fall classes begin Sept. 23. Enroll today.

NORTH SEATTLE COLLEGE



A bioengineer, Nuttada has created a device to help cut time & costs of HIV diagnosis.

Nuttada's changing the world. **She started at North**.



**Bright futures start here—with you.**
Fall classes begin Sept. 23. Enroll today.

NORTH SEATTLE COLLEGE

No. 201,996-0

Comm'n Ex. D-2-107, at 8, 7.

On August 30, 2019, the Commission received a complaint concerning this ad. JSE at 2. The Commission then charged Judge Keenan with violating Canon 1 and Rules 1.1, 1.2, and 1.3 of the Code. JSE at 3; Comm'n Ex. A-1, at 1 (Statement of Charges). Judge Keenan has no prior disciplinary history with the Commission and has fully cooperated with the proceeding. JSE at 3.

II.    THE COMMISSION FOUND THAT JUDGE KEENAN VIOLATED RULES 1.1, 1.2, AND 1.3

The Commission ruled that Judge Keenan violated Rule 1.2, which requires a judge to be impartial and to avoid the appearance of impropriety. Order at 4, 5. The Commission opined that a reasonable person could read the ad to "suggest that Judge Keenan has a leaning, or preference, and would advocate accordingly for marginalized communities." *Id.* at 7.[1] The Commission further ruled that a person not from a "marginalized community" could "reasonably be concerned about being treated unfairly by Judge Keenan." The Commission concluded that Judge Keenan violated Rule 1.2. *Id.* at 7.

---

[1] The Commission reasoned that if it were permissible for this ad to run with the language "marginalized communities," then it would also be permissible for another judge to be in an ad that says "the judge got into the law, in part, to advocate for 'divorced fathers,' or 'those accused of sex offenses,' or 'crime victims,' or 'landlords,' and then he went to North Seattle College, and now, he is changing the world"— implying that disclosing any such reasons for a judge's original decision to study law would make them unethical now. Order at 8.

4

No. 201,996-0

The Commission also determined that Judge Keenan violated Rule 1.3. That rule prohibits the abuse of the prestige of the judicial office to advance the economic interests of others. *Id*. at 8. The Commission found that "[t]he ad aimed at increasing student enrollment which, in turn, would advance the economic interests of the college." *Id*. Judge Keenan argued that his actions were permitted because the ad would encourage people to go to law school after community college. *Id*. at 9. But the Commission stated that the connection between enrollment at North Seattle College and increased law school admissions was "too tenuous or strained to be persuasive in this context." *Id*. The Commission continued that judges can promote only law schools, not other schools, and that permitting Judge Keenan's conduct would "open the flood gates to allow judges to promote any activity that could possibly encourage students to attend law school." *Id*. The Commission held that Judge Keenan "abused the prestige of his office" by using his title of "Judge" to promote the college. *Id*. at 10.

Finally, the Commission ruled that Judge Keenan violated Rule 1.1. *Id*. at 6. Rule 1.1 is a catchall—if a judge violates any other rule, then that judge violates Rule 1.1, also.[2]

---

[2] One member concurred and three members dissented in part. Comm'n Exs. A-15-18. Those four members expressed uneasiness and regret about sanctioning Judge Keenan for the ad. Order at 10-11. But all members agreed that Judge Keenan violated at least Rule 1.3. Comm'n Exs. A-15-18.

5

No. 201,996-0

The Commission sanctioned Judge Keenan with an admonishment. *Id.* at 11. Judge Keenan appeals and requests that we reverse the Commission's ruling and remand with instructions to dismiss the charges against him. Appellant's Corrected Br. at 50. For the reasons discussed below, we agree with Judge Keenan.

ANALYSIS

I.    HISTORY AND CONTEXT OF THE JUDICIAL CANONS

The Commission was established in 1980 by amendment to the Washington State Constitution. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 126 (2d ed. 2013). The Commission investigates complaints against judicial officers, conducts hearings, makes recommendations for discipline to the Supreme Court, and establishes rules of procedure for Commission proceedings. WASH. CONST. art. IV, § 31; *In re Disciplinary Proceeding Against Hammermaster*, 139 Wn.2d 211, 229-30, 985 P.2d 924 (1999). The Commission consists of three judges, two attorneys, and six nonattorneys. WASH. CONST. art. IV, § 31(1).

The Code governs judicial conduct in Washington. That code is adopted by this court. We have updated it several times, most recently in 2011.[3] We revised

_____

[3] *GR 9 Cover Sheet Suggested Amendments: Rescinding Current Code of Judicial Conduct and Adopting New Code of Judicial Conduct*, https://www.courts.wa.gov/court_rules/?fa=court_rules.proposedRuleDisplay&ruleId=175 (last visited Feb. 7, 2022).

No. 201,996-0

the 2011 CJC based on a review of the 2007 American Bar Association's *Model Code of Judicial Conduct*. Additionally, in 1983 this court established the Committee.[4] The Committee, based on its expertise, issues EAOs to help guide judges' conduct.[5] "Compliance with an opinion issued by the [C]ommittee [is] considered as evidence of good faith by the Supreme Court."[6]

II.    STANDARD OF REVIEW IN JUDICIAL CONDUCT CASES

This court reviews Commission decisions de novo. *In re Disciplinary Proceeding Against Deming*, 108 Wn.2d 82, 87-89, 736 P.2d 639, 744 P.2d 340 (1987); *In re Disciplinary Proceeding Against Anderson*, 138 Wn.2d 830, 843, 981 P.2d 426 (1999). De novo review of judicial disciplinary proceedings requires an independent evaluation of the record. *In re Disciplinary Proceedings Against Turco*, 137 Wn.2d 227, 245-46, 970 P.2d 731 (1999); *Anderson*, 138 Wn.2d at 843. The ultimate decision to issue discipline lies with the Washington Supreme Court. WASH. CONST. art. IV, § 31 (amend. 71); *Hammermaster*, 139 Wn.2d at 230 ("the constitution's use of the word 'recommend' indicates an intent to place the

---

[4] *Ethics Advisory Committee*, https://www.courts.wa.gov/judicial_education/?fa=judicial_education.ethics_display&section=Advisory (last visited Feb. 7, 2022).

[5] *GR 10*, https://www.courts.wa.gov/court_rules/?fa=court_rules.display&group=ga&set=GR&ruleid=gagr10 (last visited Feb. 7, 2022).

[6] *Id*.

7

No. 201,996-0

ultimate decision to discipline in the Supreme Court" (citing *Deming*, 108 Wn.2d at 88)). However, the Commission's findings and recommendations are given considerable weight. *In re Disciplinary Proceeding Against Kaiser*, 111 Wn.2d 275, 279, 759 P.2d 392 (1988*)*; *In re Disciplinary Proceeding Against Sanders*, 135 Wn.2d 175, 181, 955 P.2d 369 (1998). The burden of proof in judicial disciplinary proceedings is clear, cogent, and convincing evidence. *Sanders*, 135 Wn.2d at 181.

This court has not decided a case involving the 2011 CJC. When interpreting rules like those in the Code, we apply typical statutory interpretation principles. *See In re Disciplinary Proceeding Against Haley*, 156 Wn.2d 324, 333-39, 126 P.3d 1262 (2006) (interpreting Rules of Professional Conduct (RPC) 4.2(a) using traditional statutory interpretation tools); *LK Operating v. Collection Grp., LLC*, 181 Wn.2d 48, 75, 331 P.3d 1147 (2014) ("When interpreting the meaning of any RPC, we apply settled principles of statutory construction." (citing *In re Disciplinary Proceeding Against Blauvelt*, 115 Wn.2d 735, 741, 801 P.2d 235 (1990)).

Therefore, when we interpret the Code we begin with the plain language of the rule. We then consider the meaning of that language in the context of the Code as a whole. *See Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 11, 43 P.3d 4 (2002). If the rule is still ambiguous, then we resort to other aids to

8

No. 201,996-0

interpretation. *Id.* at 12. The goal of these interpretive rules is to carry out the intent of the author—in this case, the intent of this court. *Cf. id.* at 9.

    III.    JUDGE KEENAN DID NOT VIOLATE RULE 1.2

        *A.  The plain language of Rule 1.2 and its context within the Code show that Judge Keenan did not violate that rule*

The Commission ruled that Judge Keenan's decision to approve the bus ad violated Rule 1.2 because it showed that he was partial to "marginalized communities" and, hence, the ad undermined public confidence in the judiciary. Order at 6-8.

Beginning with the plain language, Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence,* integrity,* and impartiality* of the judiciary, and shall avoid impropriety and the appearance of impropriety.*[7]

The Code then defines "impartiality" as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." CJC Terminology. It defines "impropriety" as "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality." *Id*. It then defines "independence" as "a judge's freedom from influence or controls other than those established by law." *Id*.  And the Code

---

    [7] The asterisks are in the rule; they indicate words defined elsewhere in the rules.

9

No. 201,996-0

defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." *Id*.

Reviewing this language in the context of other portions of the Code, we see that the Code also provides a test for determining whether an act causes the appearance of impropriety. Rule 1.2's comment 5 states that the test is "whether the conduct *would* create in *reasonable* minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." (Emphasis added.) In other words, the test for impropriety is based on an objective standard— whether a "reasonable" viewer "would" (not just "could") perceive that the judge's conduct "reflect[ed] adversely" on the judge's honesty, impartiality, etc.—not on what a particular viewer subjectively might or could perceive. *See generally In re Reddin*, 221 N.J. 221, 231, 111 A.3d 74 (2015) (majority of states have an objective, reasonable minds test).

Thus, the key question for us in analyzing the alleged Rule 1.2 violation is whether a reasonable, objective person would read the language that Judge Keenan "got into law in part to advocate for marginalized communities" to mean that Judge Keenan would tend to rule for marginalized communities as a judge. We hold that the answer is no: that language does not suggest to a reasonable person that Judge Keenan would tend to rule for marginalized communities (over others) in cases he

10

No. 201,996-0

heard as a judge. Instead, that language explains why he wanted to be a lawyer. An objective, reasonable person would not infer from that description of his reasons for attending law school that he lacks "an open mind in considering issues that may come before [him]" as a judge. CJC Terminology ("Impartial").

The Commission did make a "factual" finding that Judge Keenan admitted that the ad could confuse the public into thinking that he advocated for marginalized communities from the bench.[8] And Judge Keenan did state that he could see how the ad "might" confuse the public.

But he did not state that it would make a reasonable person think that he would not be impartial—he made that statement in the context of explaining his willingness to hear and consider the views of colleagues. Comm'n Ex. D-2-107, at 9-10. And regardless of Judge Keenan's testimony, whether a judge's description of his reasons for attending law school would cause *an objective, reasonable person* to infer that he lacked "an open mind in considering issues that may come before [him]" as a judge is a matter that we review de novo. CJC Terminology ("Impartial"). On de novo review, we hold that the ad would not confuse a reasonable person about whether Judge Keenan could be "honest," "impartial," or "fit" as a judge.

_____

[8] Findings of Fact (FF) 12 states in whole, "Judge Keenan admitted the ad could confuse the public into thinking that he, as a judge, advocated for marginalized communities." Order at 3.

11

No. 201,996-0

The Commission also made a "factual" finding that the ad could reasonably be read to express a preference for marginalized communities.[9] The Commission based that finding on the same analysis that it used to conclude that Judge Keenan's description of his reasons for attending law school would cause an objective, reasonable person to infer that he lacked "an open mind in considering issues that may come before [him]" as a judge.

We review this decision de novo, for the reasons discussed immediately above. And we reject the Commission's "factual" finding on this matter for the reasons discussed immediately above, also: all judges decide to join the legal profession for one reason or another, and stating why you got into the law does not mean that you cannot rule impartially in a case.

Finally, the Commission seemed particularly concerned about the use of the language "advocate" in the ad. Order at 7. To be sure, it is true that a judge should not advocate for particular partisan causes. But a judge certainly *should* advocate for and "promote" access to justice and improvements to the administration of justice. The comments to Rule 1.2 say exactly that. Rule 1.2 cmts. 4 ("Judges should participate in activities that . . . promote access to justice for all."), 6 ("A judge should initiate and participate in outreach activities for the purpose of

---

[9] FF 11 states in whole, "The language of the ad can reasonably be read to express a preference or commitment in favor of marginalized communities." *Id.*

12

No. 201,996-0

promoting . . . confidence in the administration of justice."). Thus, the word

"advocate" alone does not show inappropriate partisanship. If anything, stating that

you got into law to advocate for communities that have been "marginalized" from

the benefits of the justice system might counter widespread perceptions that the

law has historically treated marginalized members of our community unfairly.[10]

> B. *Our previous cases and EAOs also show that Judge Keenan's conduct did not violate Rule 1.2*

Our decisions under earlier versions of the Code compel the same

conclusion. For example, in *Turco*, we ruled that a judge who pushed his wife to

the ground on purpose, in a public setting, violated his obligations under the Code

because complainants in domestic violence cases could reasonably question his

impartiality. 137 Wn.2d at 248 ("Fearful victims of domestic violence would

certainly be justified in questioning whether a judge who has demonstrated so little

control of his own emotions and so little restraint as to allow himself to assault his

---

[10] "African Americans and Whites are on two different ends of the spectrum, with the former exhibiting strong signs of cynicism about the ability of the justice system to provide fair, impartial, and respectful justice, and the latter displaying substantially more confidence and trust in the system." MARK PEFFLEY ET AL., WASH. STATE MINORITY & JUSTICE COMM'N, JUSTICE IN WASHINGTON STATE SURVEY 5 (2014) (report on attitudes of Washington residents pertaining to the criminal justice system, focusing on racial and ethnic group distinctions). As former Chief Justice Mary Fairhurst noted, judges are stewards of justice and "[b]eing stewards of justice means doing what we can to ensure the doors of the justice system are kept open. Our courts must be places where people can come to seek redress without fear that they will be treated unfairly or disrespectfully because of race, religion, sexual orientation, gender, or disability." Justice Mary E. Fairhurst, *Welcoming Remarks to New Bar Admittees*, 4 SEATTLE J. FOR SOC. JUST. 653, 655 (2006).

No. 201,996-0

own wife, can rule impartially and wisely in the emotion-charged arena of domestic violence."). Similarly, in *In re Disciplinary Proceeding Against Sanders*, we ruled that a Justice who visited sexually violent offenders at their detention facility—detainees with cases pending before the court—violated his duty to be, and to appear, impartial. 159 Wn.2d 517, 519-20, 145 P.3d 1208 (2006) ("His conduct created an appearance of partiality as a result of ex parte contact."). And we ruled that a judge undermined public confidence in the judiciary when he improperly threatened defendants with life imprisonment and indefinite jail sentences for failing to pay minor fines and costs (certainly, an approach that shows animus against marginalized communities). *Hammermaster*, 139 Wn.2d at 217, 235.[11] Judge Keenan's historically accurate statement that he chose law school to advocate for marginalized communities is not comparable to a sitting judge committing an act of domestic violence, visiting ex parte with litigants, or making inappropriate threats to litigants. Instead, viewed in context, it impartially promotes respect for marginalized communities.

The EAOs also support this conclusion. EAO 96-16 permitted a judge to attend a ceremony in honor of domestic violence survivors so long as the judicial

---

[11] *Cf. In re Disciplinary Proceeding Against Eiler*, 169 Wn.2d 340, 352-53, 236 P.3d 873 (2010) (plurality opinion) (judge repeatedly found to have threatened to rule against litigants who interrupted or annoyed her, derided the intelligence of pro se litigants, and "humiliated" litigants, yet still not sanctioned).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

officer did not "act as an advocate or in any manner indicate a predisposition as to how he or she might rule in a domestic violence case." Similarly, EAO 09-05 permitted a judge to maintain a blog that promoted "a more fair, just and benevolent society" so long as the judge was cautious about maintaining an appearance of impartiality. And EAO 13-02 prohibited a judge from advocating for an amendment to overturn *Citizens United*[12] but opined that the judge could engage in nonpartisan educational events regarding that Supreme Court decision. These EAOs show that a judge can attend an event related to, can educate on, and can comment on, general justice system issues that may confront the courts and still be, and appear to be, "impartial." Judge Keenan's statement is best interpreted as a comment on a general justice system issue, not as a comment on how he would rule in a case.

Based on the language and context of the Code, decisions of this court, and persuasive advisory opinions, Judge Keenan did not violate Rule 1.2.

---

[12] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

No. 201,996-0

IV.    JUDGE KEENAN DID NOT VIOLATE RULE 1.3

A. *The plain language of Rule 1.3 and its context within the Code show that Judge Keenan did not violate that rule*

The Commission found that Judge Keenan violated Rule 1.3 because "[t]he ad aimed at increasing student enrollment which, in turn, would advance the economic interests of the college." Order at 8.

Again, beginning with the plain language, Rule 1.3 states:

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests* of the judge or others, or allow others to do so.

This language was updated from the 1995 CJC. The relevant portion of Canon 2(B) stated that "Judges should not lend the prestige of judicial office to advance the private interests of the judge or others . . . ."

Significantly, the 2011 update changed the language from "lend the prestige of judicial office" to "abuse" such prestige. This change mirrored the change contained in the 2007 ABA *Model Code*. The ABA explained that it changed "lend" to "abuse" because

[i]n the Commission's view, the term "lend" created unnecessary confusion. For example, a judge who wrote a letter of recommendation for a law clerk "lent" the prestige of the judge's office to the recommendation, and some judges told the Commission that they declined to write letters on their clerks' behalf as a consequence. In the Commission's view, however, the problem that

16

No. 201,996-0

> Rule 1.3 seeks to address is more accurately characterized as "abuse"
> of the office.[13]

"Abuse" is not defined in the *Model Code*. It is defined by *Black's Law Dictionary*, in part, as "[t]o depart from legal or reasonable use in dealing with (a person or thing); to misuse." BLACK'S LAW DICTIONARY 13 (11th ed. 2019). There is no case law from this court interpreting Rule 1.3 or its 1995 *Model Code* analogue.

But it is clear that the classic example of a Rule 1.3 violation is a judge alluding to their judicial status to gain favorable treatment in encounters with traffic officials. Rule 1.3 cmt. 1. Another example is using judicial letterhead to gain an advantage in conducting personal affairs, such as inquiring into automobile registrations or real property assessments. Rule 1.3 cmt. 1; EAO 86-15. In contrast, a judge can now clearly use judicial letterhead to provide a recommendation letter. Rule 1.3 cmt. 2; EAO 86-12, 87-10, 88-05.

What is the difference between unreasonable "abuse" of judicial office and appropriate "use" of judicial office that these examples illustrate? A rule must be interpreted in the context of the entire Code and with the intent of the canons in

---

[13] REPORTER'S EXPLANATION OF CHANGES ABA MODEL CODE OF JUDICIAL CONDUCT, 2007, at 10, https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/judicialethics/mcjc_2007.pdf [https://perma.cc/3KYR-6T3V]; SUPREME COURT TASK FORCE ON THE CODE OF JUDICIAL CONDUCT 6, 131-32 (Sept. 2009), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Code%20of%20Judicial%20Conduct%20Task%20Force%20Committe/Final%20CJC%20%20Task%20Force%20Report%20Sept%2009.pdf.

No. 201,996-0

mind. *See Campbell*, 146 Wn.2d at 10-12. We therefore read Rules 1.3 and 1.2 in conjunction with Canon 3.

Canon 3 affirmatively encourages judges to participate in extrajudicial activities because such participation "helps integrate judges into their communities."[14] Rule 3.1 cmt. 1. Similarly, Rule 3.7 states in part that a judge "*may participate* in activities sponsored by organizations or governmental entities concerned with the law, the legal system, or the administration of justice" and nonprofit organizations. (Emphasis added.)[15]

---

[14] Canon 3's overarching guidance at the start of the Canon states, "A JUDGE SHALL CONDUCT THE JUDGE'S PERSONAL AND EXTRAJUDICIAL ACTIVITIES TO MINIMIZE THE RISK OF CONFLICT WITH THE OBLIGATIONS OF JUDICIAL OFFICE." Its Rule 3.1 states, A judge may engage in extrajudicial activities, except as prohibited by law* or this Code. However, when engaging in extrajudicial activities, a judge shall not: … (C) participate in activities that would undermine the judge's independence,* integrity,* or impartiality;* . . . ."

[15] Rule 3.7 states in full:

Subject to the requirements of Rule 3.1, a judge may participate in activities sponsored by organizations or governmental entities concerned with the law, the legal system, or the administration of justice, and those sponsored by or on behalf of educational, religious, charitable, fraternal, or civic organizations not conducted for profit, including but not limited to the following activities:
(A) assisting such an organization or entity in planning related to fundraising, and participating in the management and investment of the organization's or entity's funds, or volunteering services or goods at fundraising events as long as the situation could not reasonably be deemed coercive;
(B) soliciting* contributions* for such an organization or entity, but only from members of the judge's family,* or from judges over whom the judge does not exercise supervisory or appellate authority;

18

No. 201,996-0

Permissible activities include assisting and planning fundraising, appearing or speaking at events, and serving as an officer or director of an organization. *See* Rule 3.7.

In fact, comment 1 to Rule 3.7 specifically states that activities in which judges may participate "generally include those sponsored by or undertaken on behalf of public or private *not-for-profit educational institutions*." (Emphasis added.) As the emphasis shows, comment 1 makes no distinction among legal, nonlegal, postgraduate, and undergraduate types of not-for-profit educational institutions.

Further, Rule 3.7(C) permits a judge to give permission to an organization to use their title "in connection with an event of such an organization or entity, but if the event serves a fundraising purpose, the judge may do so only if the event concerns the law, the legal system, or the administration of justice."

---

(C) appearing or speaking at, receiving an award or other recognition at, being featured on the program of, and permitting his or her title to be used in connection with an event of such an organization or entity, but if the event serves a fundraising purpose, the judge may do so only if the event concerns the law, the legal system, or the administration of justice;

(D) serving as an officer, director, trustee, or nonlegal advisor of such an organization or entity, unless it is likely that the organization or entity:

(1) will be engaged in proceedings that would ordinarily come before the judge; or

(2) will frequently be engaged in adversary proceedings in the court of which the judge is a member, or in any court subject to the appellate jurisdiction of the court of which the judge is a member.

19

When considering Rule 1.3, the language change from "lend" to "abuse," and the context of the entire Code including Canon 3 and its rules and comments, we conclude that Judge Keenan's conduct does not violate Rule 1.3. Judge Keenan did not "misuse" his title or the prestige of his office. BLACK'S LAW DICTIONARY, *supra*, at 13. The Code, when read as a whole, encourages judges to participate in their communities and to work productively toward the betterment of our legal system. Comment 1 to Rule 3.7 explicitly permits judges to promote nonprofit educational institutions. The ad for North Seattle College was not even a fundraiser; it was intended primarily for recruitment.[16] While recruitment has an incidental economic benefit, just about anything that a judge would do for a college would incidentally benefit it economically. This incidental economic benefit is permissible under Canon 3 because a judge's prestige *should* be used to encourage education. Using one's judicial title for such a purpose does not constitute an abuse.[17]

---

[16] The Commission also found that the ad "*could* be viewed by a reasonable person as campaign ads for Judge Keenan." Order at 3 (emphasis added). We disagree with this finding—which is more legal than factual—because a reasonable person "would" not view this ad, which is clearly an ad for North Seattle College, as a campaign ad for Judge Keenan.

[17] Judge Keenan assigned error to FF 8, which stated that Judge Keenan reviewed Canons 1 and 3 and EAO 96-06 but "did not do any further research" or "talk with anybody about his ethical concerns." Order at 3. Judge Keenan contends that he read multiple EAOs and also examined commission decisions. TP at 59. The Commission is certainly entitled to decline to credit his testimony, but it is not clear from its decision

No. 201,996-0

The parties spend a significant amount of time debating whether encouraging admissions to a community college has a sufficient connection to "the law, the legal system, or the administration of justice" to permit Judge Keenan's activity. This relates to Rule 3.7's language permitting judges to undertake conduct "concerned with" such law and justice activities. *See, e.g.*, Appellant's Corrected Br. at 45-47; Resp't's Br. at 15.

We agree with Judge Keenan that in this context, the involvement with the nonprofit community college did concern the administration of justice.[18] As our open letter of June 4, 2020, noted, "Too often in the legal profession, we feel bound by tradition and the way things have 'always' been"—we must work to eradicate "systemic inequities." Supporting community colleges may be one

---

whether the Commission declined to credit it or merely overlooked it. In any case, the finding is irrelevant to whether he violated the rules.

[18] Laura Rothstein, *Shaping the Tributary: The Why, What, and How of Pipeline Programs to Increase Diversity in Legal Education and the Legal Profession*, 40 J.L. & EDUC. 551 (2011) (discussing various ways to increase diversity in the legal community, including early education intervention); E. Christopher Johnson Jr., *Pipeline Programs Increasing Diversity and Creating Responsible Citizens and Leaders*, 32 MICH. B.J. 33 (2012) (discussing how educational programs are essential to increasing diversity in the legal community); Jason P. Nance & Paul E. Madsen, *An Empirical Analysis of Diversity in the Legal Profession*, 47 CONN. L. REV. 271, 316-18 (2014) (finding that "Hispanic Americans" and African Americans are as underrepresented in the legal profession as in other prestigious professions, suggesting earlier intervention in education could help increase diversity in the legal field).

No. 201,996-0

important way to increase diversity and access to the legal community—certainly

an impact that improves the "administration of justice."[19]

### B. *The EAOs also support the conclusion that Judge Keenan's conduct did not violate Rule 1.3*

To be sure, the EAOs state that a judge should not solicit funds for charitable

organizations or advertise for businesses. For example, EAO 20-01 concluded that

a webpage that promoted an individual judge's availability to perform wedding

services and listed the cost of such services would violate Rule 1.3 because it

"begins to creep into the realm of advertising and solicitation." Similarly, EAO 87-

04 opined that it was impermissible for a judge to permit a friend to place the

judge's quote in a flyer advertising a business that works with law firms in the area

where the judge sits, even if the judge's nonjudicial former title was used.

This bar against soliciting and advertising, however, does not apply the same

way to the promotion of certain educational institutions or organizations. The

EAOs themselves say that. *E.g.*, EAO 93-31 (a judicial officer can allow a law

student association to establish a scholarship in their name, as long as that judicial

officer refrains from fundraising for the scholarship).

---

[19] Letter from Wash. State Supreme Court to Members of Judiciary & Legal Cmty. (Wash. June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%2006040420.pdf [https://perma.cc/QNT4-H5P7].

22

No. 201,996-0

Judge Keenan testified that he relied heavily on EAO 96-06, which *permitted* a judicial officer to appear in a promotional law school video that the school sent to prospective students. The Committee stated that this video complied with the Code, as long as the judge's comments in the video reflected that judge's own personal experiences and observations while attending (or teaching at) the school. EAO 96-06. The opinion states that a judge "may contribute to the improvement of the legal system and the administration of justice by *assisting law schools in recruiting the most qualified individuals* into the legal profession." *Id*. (emphasis added).

The language of these two cited advisory opinions is certainly limited to law schools. The logic of those advisory opinions, however, extends further. Those opinions—especially EAO 96-06—recognize that a judge contributes to the improvement of justice by helping get "the most qualified individuals into the legal profession," and permit judges to promote law schools for that reason. But many of "the most qualified individuals" for "the legal profession"—and probably many from marginalized communities—might start at community colleges. It necessarily follows that a judge may contribute to the improvement of justice by helping get "the most qualified individuals into the legal profession" by promoting the educational opportunities afforded by their own former community college.

23

Our conclusion finds further support in EAO 21-02. In that opinion, the Committee concluded that Rule 1.3 permits a judge to write a letter to prospective law students on behalf of the judge's law school "in an effort to further diversity at the law school." EAO 21-02. The Committee found that this situation was similar to the one described in EAO 96-06 because "(1) [] *recruitment of law school students* is directly related to improving the law, the legal system, and the administration of justice; (2) [] the letter will be sent to prospective law students only and is *not associated with general fundraising* efforts; and (3) [] *the judge is speaking about their personal experience* during their time as a law student and practicing law in the same community." EAO 21-02 (emphasis added). As the emphasized material shows, although this opinion is limited to law schools, its logic applies to other schools from which quality law students might be drawn: it states that the recruitment conduct is permissible because it focuses on recruiting quality law students, on doing that recruitment separately from general fundraising efforts, and on recruiting based on the judge's personal experience during their time as a student. All of those prerequisites to permissible recruitment activities are satisfied here.

The Office of Disciplinary Council (ODC) came to a contrary conclusion. In doing so, it relied heavily on the medium that the school used to communicate Judge Keenan's support of his nonprofit alma mater: a bus advertisement. To be

24

sure, a bus advertisement differs dramatically from a pamphlet mailed to a targeted house, a video sent to targeted prospective students, or to appearances in law school alumni publications—all of which many judges do. *See* EAO 21-02, 96-06. But the difference lies mainly in who, and how many, people these ads and publications reach. Law school magazines, videos to prospective students, and published books reach a narrow, primarily self-selected, audience; bus ads, like social media postings, reach a broader audience. The ODC's decision thus ends up punishing judges for communications that have a broad and nondiscriminatory, rather than a narrow and targeted, reach.

We find no support in the rules for that approach. Instead, we hold that the rules—especially Rule 3.7 and its comments—take the opposite approach. As comment 1 to Rule 3.7 states, the activities in which judges may participate "generally include those sponsored by or undertaken on behalf of public or private *not-for-profit educational institutions.*" Judge Keenan's promotion of North Seattle College did not violate Rule 1.3.

No. 201,996-0

V.      JUDGE KEENAN DID NOT VIOLATE RULE 1.1

Rule 1.1 is a catchall rule that states, "A judge shall comply with the law,* including the Code of Judicial Conduct." The Commission found that Judge Keenan violated Rule 1.1 because he violated Rules 1.2 and 1.3. Order at 6.

Judge Keenan did not violate Rules 1.2 or 1.3. He therefore did not violate Rule 1.1.

CONCLUSION

Judge Keenan did not violate the Code when he approved a bus ad to support his nonprofit alma mater, North Seattle College. The language that he "got into law in part to advocate for marginalized communities" did not violate his duty to be, and to appear, impartial; thus, he did not violate Rule 1.2. The ad did not violate Rule 1.3 because the rules, read as a whole, permit judges to promote nonprofit educational institutions that they credit for their success, in an effort to attract the most qualified people to the legal profession. As a result, Judge Keenan did not violate Rule 1.1, either.

The Commission's decision is reversed and the charges are dismissed.

No. 201,996-0

Gordon McCloud, J.

WE CONCUR:

González, C.J.

Yu, J.

Johnson, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.

Stephens, J.

Fearing, J.P.T.

27